John DANIEL, for himself and on behalf of all others similarly situated, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, a Labor Union Organization, et al., Defendants.

No. 74 C 2865.

United States District Court, N. D. Illinois, E. D.

March 1, 1976.

Lawrence Walner & Associates, Ltd., Peter J. Barack, Chicago, Ill., for plaintiff.

Sherman M. Carmell, Bernard Weisberg, Chicago, Ill., Thomas W. Mack and Sidney Dickstein, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

KIRKLAND, District Judge.

This matter comes before the Court on motions by certain defendants to dismiss the complaint. The action is in six counts and seeks relief under the Securities Act of 1933 ("1933 Act"), the Securities Exchange Act of 1934 ("1934 Act"), the National Labor Relations Act ("NLRA") and pendent claims of common law fraud and deceit and breach of trust. Jurisdiction is invoked under 15 U.S.C. §§ 78a–78jj, 77a–77aa, 28 U.S.C. § 1337 and 29 U.S.C. § 185(a) and under principles of pendent jurisdiction.

. Plaintiff is a resident of Illinois and a member of Local 705 International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 705"). Defendants are International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT"), a labor union; Local 705; Louis Peick, a Trustee, and Officer of Local 705 Pension Fund; the Local 705 Pension Fund; and other Trustees of the Local 705 Pension Fund ("Trustees"). Moving defendants are IBT, Local 705 and Louis Peick. The Pension Fund and other named Trustees were added as defendants pending decision on these motions and no motions by those defendants are presently before the Court. The action is framed as a class action, both as to plaintiff and defendant classes.

The complaint alleges that plaintiff worked for Local 705 covered employers for a total of twenty-two and one-half years. This employment was uninterrupted with the exception of a several month absence beginning in December of 1960. This absence, resulting from an involuntary lay-off, was the basis for a decision by Trustees of the Local 705 Pension Fund to deny plaintiff his pension benefits.

Plaintiff alleges that this action by the Trustees, as well as defendants' maintenance and administration of the Pension Fund, is violative of the antifraud provisions of the federal securities laws, and of certain requirements of the NLRA and is in breach of defendants' common law trust and fiduciary duty.

Defendant IBT has filed a motion to dismiss only as to Counts I and II. De-

fendants Local 705 and Peick (collectively referred to as "local defendants") have raised additional challenges. The Court will consider their arguments in sequence.

## COUNTS I and II

Counts I and II of the complaint seek relief for defendants' fraudulent and intentional misrepresentations and omissions with respect to the sale to members of the plaintiff class of interests in Teamster union pension funds, all in violation of Section 17(a) of the 1933 Act and Section 10(b) and Rule 10b–5 of the 1934 Act.

Local defendants argue that Counts I and II are barred by the statute of limitations. It is not disputed that the Seventh Circuit holding in *Parrent v. Midwest Rug Mills, Inc.,* 455 F.2d 123 (7th Cir. 1972) provides that the applicable statute of limitations for an action for fraud under these sections is the three year period provided in the Illinois Securities Act, Ill.Rev.Stat. ch. 121½, § 137.-13(D) and that:

> Under Illinois Securities Law, a buyer has three years to sue "not only from the date the right first accrues, but from the date the sale is completed". (455 F.2d at 128)

Plaintiff, however, argues that notwithstanding the three year statute of limitations, the federal tolling doctrine will delay running of the limitations period until the fraud is discovered "though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party". *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743, 748 (1945). It was added in *Parrent* that the courts will:

> read into the three-year limitation applied in the Rule 10b–5 count the 'equitable doctrine' that the statute does not begin to run until the fraud is discovered where a plaintiff injured by fraud "remains in ignorance of it without any fault or want of diligence or

care on his part . . ." (455 F.2d at 128)

■ Defendants initially argue that plaintiff has admitted to actual knowledge, as evidenced by the fact that the complaint alleges that misrepresentations and omissions of material fact began as early as 1955 and have continued until the present time.

The Court does not find this argument persuasive. Plaintiff's allegations that misrepresentation began twenty years ago cannot be construed as an admission that plaintiff had knowledge of those misrepresentations at the time they were made. The crux of plaintiff's complaint is that he first learned of the fraud perpetrated upon him when he was denied his pension.

Defendants argue at length that plaintiff in fact had actual knowledge of the break in service rule and its application and consequences for many years. In support of their claim, they state that the eligibility rule was passed in early 1955 and communicated to the employee-participants, including plaintiff, by letter in April of that year. Relevant information was compiled in booklet form and sent to each participant in 1958 and 1969, years in which plaintiff was a participant. Likewise, the eligibility requirements were set out in letters of May 19, 1971 and June 11, 1971. Finally, since 1959 the trust agreement itself has been available for inspection at the Local 705 Pension Fund office or would have been sent to plaintiff's home upon his written request.

At the outset, plaintiff contends that defendants have incorrectly determined when the sale was completed, and have thus incorrectly applied the *Parrent* rule to the facts. Plaintiff argues that the "sale" was completed within the three year period preceding the complaint. In particular, he argues that there was a continuing fraudulent offer to plaintiff dating from 1955 to the time of his retirement on December 1, 1973. Alternatively, plaintiff argues that there was a sale for each pay period when plain-

tiff's employer made a contribution to the fund on his behalf and that many such contributions were made within the statutory period.

Taking all of defendants' arguments as true, the most that can be said is that plaintiff was put on notice that twenty years of continuous service was required. These arguments go to only one of several misrepresentations alleged in the complaint.

Plaintiff has stated in an affidavit that he had no actual notice of the ongoing misrepresentation. The question, then, becomes whether he should have known of the fraud in the exercise of proper diligence or care on his part.

█ First, as plaintiff correctly observes, there is a fiduciary relationship between the parties. In such a situation there is a lesser degree of inquiry demanded of the trusting, yet defrauded plaintiff.

> The concept of due diligence is not imposed within the frame of a rigid standard . . . . A fraud. . . . convincingly practiced upon its victim may justify much greater inactivity. The presence of a fiduciary relationship . . . bears heavily on the issue of due diligence.

*Azalea Meats, Inc. v. Muscat*, 386 F.2d 5, 9 (5th Cir. 1967). *Accord Racine v. Essex Wire Corp.*, (69–70 Transfer Binder) CCH Fed.Sec.L.Rep. ¶ 92,746 at 99,247 (N.D.Ill.1970). The Court takes special note of the argument that the state of mind of the defrauded plaintiff had been anesthetized and put to rest by the "fraternal"—if not paternal—proclamations of defendants relative to their concern for plaintiff's welfare.

Second, the reasonableness of the degree of inquiry expected is properly gauged against plaintiff's level of education and sophistication. Plaintiff states in his affidavit that he has an eighth grade education. He further states that whatever information was provided by defendants was obfuscated by many pages of small print and couched in ambiguous or technical language.

█ Here in effect defendants ask for summary judgment on the question of whether plaintiff had actual knowledge or should reasonably have known of the fraud. It was correctly stated in *Azalea Meats, supra* :

> Inevitably the factual issue of due diligence involves . . . the state of mind of the person whose conduct is to be measured against this test and it is simply not feasible to resolve such an issue on motion for summary judgment. (386 F.2d at 10)

The Court concludes that a genuine issue of material fact exists with respect to this issue. Certainly, this Court cannot say that plaintiff can prove no set of facts in support of his claim that he did not have actual knowledge and that he remained in ignorance of the fraud without any fault on his part. This is particularly true in view of the potential vagaries of the disclosure material, the amount of material surrounding the alleged disclosures and the general level of education and sophistication of the plaintiff.

Defendants make much of the fact that, according to the terms of the trust agreement, plaintiff had an unqualified right to have the Trustees construe the service rule at any time. This argument does not meet arguments raised by plaintiff relative to his state of mind and the resulting reasonableness of his failure to seek such a ruling.

Because of the Court's holding relative to plaintiff's knowledge of the facts, the Court need not reach the question of whether plaintiff instituted his action within three years after the time that the sale was completed.

All defendants argue that this Court does not have subject matter jurisdiction with respect to Counts I and II of the complaint and that those counts do not state claims upon which relief can be granted under either the 1933 or 1934 Acts.

Plaintiff's theory is that, as a member of Local 705, he acquired an interest in the pension fund of that Local, which

interest constituted a security; that defendants made misleading statements of material fact and omitted to disclose material facts regarding the length and continuity of service requirements of the Local 705 Pension Plan; and that he suffered loss and injury as a result of such misstatements and omissions. These misstatements are alleged to have violated Rule 10b–5 and Section 10(b) of the 1934 Act, and § 17(a) of the 1933 Act, each of which prohibits fraudulent practices and inadequate disclosure of material facts in connection with the sale of securities.

Defendants' arguments may be briefly summarized as follows:

1. Congress has viewed the securities laws as inapplicable to employee pension plans and has enacted other legislation designed specifically to deal with such funds; and

2. The Securities and Exchange Commission, ("SEC"), the agency charged with administration of the federal securities laws, has consistently ruled that no offer or sale of securities under the securities laws is involved in the establishment and operation of employee pension funds which, as here, are compulsory and non-contributory.

As pointed out by IBT, the overall purpose of the securities laws is to assure informed investment decisions by prospective purchasers of securities. This is accomplished by (a) requiring disclosures in registration statements and prospectuses where securities are offered to the public; (b) by periodic reports and proxy statements of publicly held companies; and (c) by antifraud provisions which broadly prohibit inadequate disclosure of material facts and other fraudulent practices in connection with sale of securities. Each of the two acts contains broad definitions of the terms "security", "sale" and "offer for sale".

Section 2(1) of the 1933 Act defines a security as follows:

Any note, stock, treasury stock, bond, debenture, evidence of indebtedness, *certificate of interest or participation in any profit-sharing agreement*, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for security, fractional undivided in oil, gas, or other mineral rights or, in general, any interest or instrument commonly known as a "security" . . . (emphasis added.)

The definition found in Section 3(a)(10) of the 1934 Act is substantially the same.

Section 2(3) of the 1933 Act defines sale as follows:

The term "sale" or "sell" shall include every contract of sale or *disposition* of a *security* or interest in a security, *for value*. The term "offer to sell", "offer for sale", or "offer", shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value. . . . (emphasis added.)

Section 3(a)(14) of the 1934 Act contains a similar definition.

Defendants correctly observe that, apart from the general definitions set out above, the Acts, as originally enacted, offer no explicit answer to the question of whether the employee pension plans of the type referred to in the complaint involve an offer or sale of securities within the meaning of the federal securities laws. As originally enacted, neither Act contained any reference to such plans. Nor is any reference contained in their legislative history.

As a preliminary matter, the Court will consider the argument raised by defendants Local 705 and Peick that Section 17(a) of the Securities Act does not create a private cause of action. Defendants rely on *Welch Foods, Inc. v. Goldman, Sachs & Co.,* D.C., 398 F.Supp. 1393, CCH Fed.Sec.L.Rep. ¶ 94,806 (S.D. N.Y.1974) and *Ferland v. Orange Groves of Florida, Id.,* D.C., 377 F.Supp. 690, ¶ 94,821 (M.D.Fla.1974).

■ The Court agrees with plaintiff in his assertion that Section 17(a) impliedly provides for a private cause of action. There are several cases arising out of

this district so holding, as well as a Seventh Circuit opinion. *See Surovitz v. Hilton Hotels Corp.*, 342 F.2d 596 (7th Cir. 1975) reversed on other grounds, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966). *See also Local 734 Trust v. Continental Illinois National Bank & Trust Co.*, (73–74 Transfer Binder) CCH Fed. Sec.L.Rep. ¶ 94,565 at 95,963 (N.D.Ill. 1974). Those cases relied upon by defendants are distinguishable.

■ The first question to be considered is whether the Securities Acts are, by their own terms, applicable to employee pension plans. The Court is of the opinion that they are facially applicable, and nothing in the Acts' legislative history suggests that a contrary interpretation is required. Indeed, examination of legislative history and hearing testimony discloses both Congress' and the SEC's recognition of this fact.

In 1934 the Senate proposed amendments to the 1933 Act which would have exempted from registration certain offerings made solely to employees of an issuer. The amendment was rejected in conference for the stated reason that participants in such plans may be in as great need of such protection as other members of the public. *See* H.R. No. 1838, 73 Cong., 2d Sess., at 41 (1934).

In the hearings which accompanied proposed amendments to both Acts in 1941, SEC Commissioner Purcell observed with reference to the Congressional action of 1934:

> With this clear statement of Congress before it, the Commission certainly had no alternative but to interpret the act as applying to employee's plans which involve the sale of a security. Any plan under which employees are given the opportunity to place part of their earnings in a fund which is to be invested for their benefit and returned to them at a later date involves the offering of an "investment contract". In fact, many employee plans are in the nature of investment trusts and are indistinguishable in legal effect from investment companies offering securities to the public at large.

Hearings on Proposed Amendments to Securities Act of 1933 and Securities Exchange Act of 1934 Before House Committee on Interstate and Foreign Commerce, 77 Cong., 1st Sess. 907, 908 (1941) ("1941 Hearings").

The Court concludes, therefore, that to the extent employee pension plans in fact involve the *sale* of *securities*, the Securities Acts are by their own terms applicable to such plans.

■ The Court must next determine whether, as defendants suggest, enactment of specialized pension legislation disclosed Congressional intent that the Securities Acts, including the antifraud provisions, are inapplicable to pension plans, notwithstanding the fact that such plans may be securities within the meaning of those Acts.

Defendants devote many pages in their extensive briefs to discussion of the burgeoning field of pension legislation, including the Investment Company Act of 1940 ("1940 Act"), the 1958 Welfare and Pension Plans Disclosure Act ("1958 Act"), the Investment Companies Amendment Act of 1970 ("1970 Act") and the Employee Retirement Income Security Act of 1974 ("1974 Act"). They argue at great length that this massive body of legislation is indicative of Congress' belief that private pension plans were afforded no protection by the federal securities laws, and that such legislation filled a large gap in the law.

After examining defendants' arguments and the legislative history itself, the Court has ascribed a significance to this legislation which does not agree with defendants' view. At the outset it should be noted that, except in those cases where recognized securities were offered by an employer for voluntary purchase by employees, the SEC acted on the assumption, consistent with existing legal thought, that employee pension plans were generally "non-contributory" and "involuntary", and therefore resulted in no sale and no nexus to the securities laws.

It follows then, that the SEC's position with respect to applicability of the secu-

rities laws to pension plans reflected this assumption, which is here challenged by plaintiff. As explained by Commissioner Purcell during the 1941 Hearings:

> [E]ven where the plan involves securities, registration is not required for the many cases where the employees pay nothing for the securities, but receive an interest in the investment fund by way of bonus from their employer; for, of course, a gift is not a sale, and the Securities Act is concerned only with sales of securities. Similarly, compulsory plans do not require registration. If a plan is so set up that participation in it is a condition of employment, the Commission has taken the position that, as in the case of a noncontributory or bonus plan, there is no sale involved. The purpose of the registration provisions of the Securities Act is to disclose to prospective investors the essential facts about securities which they are asked to buy, and if the employees are given no choice as to whether to buy or refuse to buy there hardly seems any point in the registration process. As a practical matter, people do not decide, it seems to me, to take jobs or leave them because they like or dislike the company's investment plan. (1941 Hearings at 907, 908, 950)

It is logical to conclude, then, that pension legislation was generated in part out of a conviction that the Securities laws did not protect pension plans because they did not involve sales, as well as recognition of the need for specialized treatment.

This latter factor is an important one. Assuming, *arguendo*, that pension plans are securities and come within the purview of the Securities laws, their unique characteristics nonetheless give rise to a need for special regulation. This alone explains the proliferation of pension legislation. Indeed, the very fact of their recognition as securities could account for the extensive and detailed requirements relative to disclosure and administration of these plans.

In the 1970 Act Congress provided that certain types of pension funds or profit sharing plans, described in Section 3(a) as securities, which meet the requirements of Section 401 of the Internal Revenue Code, would be exempted from registration under Section 5 of the 1933 Act. The Act also provided for a similar exemption to registration under Section 3(a)(12) of the 1934 Act. In any event, as is clear from the statutory language, Congress recognized such pension funds as securities.

Examination of the legislative history surrounding these various enactments of pension legislation leads to the conclusion that these Acts were designed to complement the securities laws rather than displace them. Enactment of this legislation is in no way inconsistent with the view that Congress regarded pension funds as unique forms of securities which were not adequately regulated by the securities laws.

As was made particularly clear in the Congressional Reports accompanying enactment of the 1974 Act, that Act was concerned with ongoing administration of pension funds, rather than with any sales in connection therewith. Thus, both the Senate and House Reports expressed concern over the absence of effective federal legislation directed at assuring equitable and fair administration of all pension plans. Specifically, the lack of federal controls was seen with respect to protection of the employee's security in his pension rights, rather than prevention of fraud in the sales or acquisition of that interest. Consistent with this view, the 1974 Act imposed criminal sanctions for any attempt to interfere with any employee's attainment of rights under the Act. Similarly, as noted in these reports, the 1958 Act criminalized only malfeasance with respect to administration of such plans, including theft, embezzlement, bribery and kickback. *See* H.R. No. 93–533, 3 U.S. Code Cong. and Admin.News, p. 4639 (1974); S.R. No. 93–127, 3 U.S.Code Cong. and Admin.News, p. 4838 (1974).

It is significant to note that this entire body of pension legislation is concerned with administration of such funds, so as to protect the interest of its participants, rather than regulation of circumstances of entry into the plan.

This Court holds that Congress has not demonstrated, through extensive pension legislation or otherwise, any intent to make securities laws inapplicable to employee pension funds. Accordingly, this Court finds that, to the extent any employee pension plan involves a sale of a security within the meaning of the federal securities laws, those laws, including their relevant antifraud provisions, will apply.

Further, assuming *arguendo* that defendants are correct in their assertion that pension legislation disclosed Congressional intent that pension plans such as the Local 705 Pension Plan not be procedurally regulated by the Securities Acts, it does not necessarily follow that those plans are beyond reach of the antifraud provisions.

Both the 1958 Act and the 1970 Act contain savings clauses providing for the continued application of all other relevant legislation. The 1958 Act provided:

> The provisions of this [Act] . . . shall not be held to exempt or relieve any person from any *liability, duty, penalty,* or *punishment* provided by any present or future law of the United States or of any State affecting the operation or administration of employee welfare or pension benefit plans . . . (29 U.S.C. § 309(b)). (emphasis added.)

The provision in the 1970 Act is essentially the same.

Further, the House Report accompanying the 1970 Act contained this explicit comment:

> [this section] should exempt . . . bank . . . administered . . . pension plans from the registration and reporting requirements of the Federal Securities Act, but it does not exempt them from the antifraud provisions of those acts.

H.R. No. 91–1382, 91st Cong., 2d Sess. at 10 (1970). *See also* S.R. No. 91–184, 3 U.S.Code Cong. and Admin.News, pp. 4897, 4907 (1970). The Reports suggest that such plans were exempted from registration so as to ease potential hardship on small banks.

Nonetheless, those considerations which might justify a plan's exemption from registration or even its exemption from the procedural regulatory provisions of the securities laws do not operate to prevent application of the antifraud provisions. As stated by one commentator:

> Since these antifraud provisions do not impose an undue burden on anyone, there is no reason why they should not remain as remedies available to employees for use in cases where fraud of the kind covered by these sections has been committed.

Mundheim and Henderson, "Applicability of the Federal Securities Laws to Pension and Profit Sharing Plans," 29 Law and Contemporary Problems, 795, 814 (1964).

The Court having determined that the antifraud provisions of the Securities Acts are applicable to those pension plans which involve sales of securities, the Court must next ascertain whether plaintiff's acquisition of an interest in the Local 705 Pension Fund constituted a sale of a security within the meaning of those Acts. The operative antifraud provisions of both Acts require: (1) use of the jurisdictional means; (2) making of material misrepresentations, omission to state material facts or use of manipulative or fraudulent devices, in connection with: (3) the *sale*—of a *security*. For purposes of determining applicability of the antifraud provisions, use of the mails as the jurisdictional means and omission to state material facts are not in dispute. The Court turns first to the question of whether plaintiff's interest in the Local 705 Pension Fund was a security.

■ Section 2(1) of the 1933 Act defines security in pertinent part as:

. . . any . . . certificate of interest or participation in any profit-sharing agreement, . . . [or] investment contract . . .

The definition found in Section 3(a)(10) of the 1934 Act is substantially the same.

In *SEC v. W.J. Howey, Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244, 1249 (1945), the Supreme Court observed that federal securities legislation

embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and varied schemes devised by those who seek the use of the money of others on the promise of profits. (328 U.S. at 299, 66 S.Ct. at 1103, 90 L.Ed. at 1249)

Because the 1933 and 1934 "Acts were designed to protect the American public from speculative or fraudulent schemes, . . . Congress defined the term 'security' broadly and the Supreme Court in turn has construed the definition liberally." *SEC v. Glenn W. Turner Enterprises, Inc.,* (72–73 Transfer Binder) 9 Cir., 474 F.2d 476, CCH Fed.Sec.L.Rep. ¶ 93,748 at 93,271 (9th Cir. 1973).

Plaintiff argues that, in applying this definition of security to characterize his interest in the Local 705 Pension Trust Fund, the Court must:

be guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation. One of its central purposes is to protect investors through the requirement of full disclosure . . . In searching for the meaning and scope of the word "security" in the Act, form should be disregarded for substance and emphasis should be on economic reality.

*Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). *See also SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Recognizing this need for a liberal construction of the word 'security', the courts have construed that word as bringing within the ambit of the Acts "many forms of transactions which, on their face, do not appear to be securities in the commercial sense of the word." Feldman & Rothschild, "Executive Compensation & Federal Securities Legislation," 55 Mich.L.Rev. 1115, 1117 (1957).

Thus the courts have held such economic interests as self-improvement courses, *SEC v. Glenn W. Turner Enterprises, Inc., supra* ; beaver farms, *Continental Marketing Corp. v. SEC,* 387 F.2d 466 (10th Cir. 1967); whiskey sales contracts, *Penfield Co. of Cal. v. SEC,* 143 F.2d 746 (9th Cir. 1944); pyramid sales schemes, *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974); variable annuities, *SEC v. Variable Annuity Life Ins. Co.,* 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); and mineral leases, *Roe v. United States,* 287 F.2d 435 (5th Cir. 1961) to be securities.

Plaintiff characterizes his interest in the Local 705 Pension Fund as an investment contract within the meaning of the Securities Act, a proposition only inferentially challenged by local defendants and unchallenged by IBT. The Supreme Court in *SEC v. W.J. Howey Co., supra,* defined an investment contract to mean:

A contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interest in the physical assets employed in the enterprise. (328 U.S. at 298, 299, 66 S.Ct. 1100 at 1103, 90 L.Ed. 1244 at 1249)

*See Koscot Interplanetary, Inc., supra.* Here plaintiff argues that the Local 705 Pension Fund contains all elements of the *Howey* rule, in that money is invested in a common enterprise, management of which is committed to a third party and from which income and profits are expected.

First, plaintiff characterizes the Local 705 Pension Fund which receives these

contributions as the common enterprise. Plaintiff correctly observes that pension plan contributions are now uniformly recognized as part of employee wages. S.Rep. No. 1440, 85th Cong., 2d Sess. 4 (1958). *See also Inland Steel v. NLRB,* 77 NLRB 2 (1948), 170 F.2d 247 (7th Cir. 1948), cert. den. 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949). These bargained-for contributions represent a substantial economic portion of those wages and represent the employee's investment.

Second, the trustees have the sole power of control over the common enterprise and investment of all assets contained therein. *See* Amended Trust Agreement, Art. 4, Sections 1, 2 and 3.

Finally, profits are expected from the successful management of the funds in the form of retirement benefits. That such benefits are fixed does not eliminate the element of profits. Plaintiff analogizes this to the fixed interest rate on a bond or debenture. The total amount of expected payout for any member will exceed the aggregate of those contributions made on his behalf. This excess will constitute a profit in the form of capital gains, interest and dividends and other accumulated earnings realized from successful management of the trust. Also, there is no warranty that the trust will be able to fund the supposedly fixed benefits due to members of the plaintiff class, and the holders thus bear an element of risk in this investment of their wages. *See Silver Hills Country Club v. Sobieski,* 55 Cal.2d 811, 361 P.2d 906 (1961).

The conclusion that a beneficial interest in Local 705 Pension Fund is a security finds further support in public policy underlying the remedial nature of the federal securities laws which are aimed at prevention of frauds in the sales of securities and protection of investors. In light of this special remedial purpose, one commentator has characterized a security as an interest distinguished from the generality of interests:

> "so as to create a need for the special fraud procedures, protections, and remedies provided by the securities laws." Coffey, "The Economic Realities of a 'security': Is there a More Meaningful Formula," 18 West.Res.L. Rev. 367, 373 (1967)

Plaintiff points to the magnitude of the pension funds, now estimated to exceed 150 billion dollars, and their economic importance to over 30 million Americans who rely on such plans for their financial security. According to one recent Senate study, as few as eight percent of those participants in pension plans with vesting requirements of eleven years or more will ever receive any pension benefits. Interim Report of Activities of Private Welfare and Pension Plan Study, S.Rep. No. 92–634, 92nd Cong., 2nd Sess., at 15,115–153 (1972).

Plaintiff argues, and the Court agrees, that there is a great need for the application of the special fraud provisions, protections and remedies of the Securities Acts to plans such as the Local 705 Pension Fund. This need is not met by either qualification under Section 401 of the Internal Revenue Code or by filings under the 1958 Act, or other pension legislation. Disclosure under the Code "does not necessarily satisfy Securities Act disclosure standards which require that the facts must be disclosed in a form which is clearly understandable to the ordinary investor." Mundheim & Henderson, *supra* at 806. The primary purpose of the Code is not protection of the investor, but rather production of revenue and prevention of tax evasion.

Likewise, under the 1958 Act, the participant must take the initiative in seeking information to which that Act says he is entitled. That is because the Act is designed to regulate misuse of funds and disclosure rather than fraud. The Securities Acts, however, place the burden of disclosure on the seller of a security. This is in recognition of the fact that fraud, by its very nature, is practical upon the unknowing. An employee who is unaware of a fraud being perpetrated upon him is not benefited by a provision which requires disclosure only upon his request.

Accordingly, the Court holds that plaintiff's interest in the Local 705 Pension Fund is an investment contract within the meaning of the Securities Acts and further that this result is consistent with the remedial purpose of that body of legislation. That being so, the Court does not reach local defendants' argument that plaintiff's interest cannot be described as an interest in a profit-sharing plan.

█ Finally, the Court must determine whether plaintiff's acquisition of an interest in the Local 705 Pension Fund constituted a sale within the meaning of the securities law. Sale is defined in Section 2(3) of the 1933 Act as

> Every . . . disposition of a security or interest in a security, for value.

The definition found in Section 3(a)(14) of the 1934 Act is substantially the same.

It is apparently conceded that whether the transfer involved a gift, sale or otherwise, there was a disposition and that the only issue here is whether this disposition was for value.

Defendants argue that the complaint itself discloses that the Local 705 Pension Fund is both "involuntary" and "non-contributory", in that it is funded by employer contributions and that members of the Local come under this plan automatically by reason of their union membership and employment, and not by any choice on their part. Such plans, defendants argue, have been consistently found by the SEC to lack the "sale" element.

According to defendants the SEC has declined to assume that an employee, who participates in a pension plan which is an incident of his employment, and in exchange for which he pays no additional consideration, and to which he makes no contributions, decides whether or not to work because of the nature and terms of the plan. The employee in this situation is not an investor. It is particularly true, they argue, that there is no choice of whether or not to participate where, as here, the pension plans are typically negotiated on an industry-wide basis in the local area and every covered employer in that industry in that area contributes to the same plan on the same basis for each employee who belongs to the union.

As has been earlier discussed in this opinion, the SEC has taken the position that with respect to those employee pension plans characterized as "involuntary" or "non-contributory", there is no sale within the meaning of the Securities Acts. In cases of non-contributory plans, the SEC has found that employees did not receive their security interests for value, but rather as gifts. Alternatively, in cases of involuntary plans, the SEC took the position that employees made no investment decision. Since the purpose of the securities laws was to assure informed investment decisions by prospective purchasers of securities, the SEC concluded that if no investment decision is being made, these laws do not logically apply.

Plaintiff responds that in this case there was a disposition for value. He argues that the value element was satisfied by the giving of services or, alternatively, by the contribution of a portion of wages. Plaintiff asserts that in view of the vast amounts of money contributed by employers to employee pension plans—now estimated to exceed 150 billion dollars—the only responsible view is that such monies are given in return for value rendered.

Further, the Local 705 Pension Fund is an object of collective bargaining. Both Congress and the courts have adopted the view that employer contributions to employee pension plans constitute a part of the total wage structure. See S.Rep. No. 1440, supra, and Inland Steel, supra. Thus plaintiff's consideration includes not only services rendered but a portion of wages received.

These bargained for employer contributions on behalf of the members of the plaintiff class represent a substantial economic portion of the wages given to employees in consideration of services performed. As part of the employee's

contribution, they constitute the employee's giving of value for his interest in the plan. The Court agrees with plaintiff that economically there is no distinction between the facts here and the situation whereby the employee first receives as part of his wages the employer contribution in cash and then pays such cash over to the pension fund.

This view that the employee has given value has already received support from the courts. In *Collins v. Rukin,* 342 F.Supp. 1282 (D.Mass.1972), the Court held that plaintiff's performance of services satisfied the value requirements of a sale. The Court there stated:

> the broad design of the federal securities laws should not be frustrated by restrictive application of the purchase-sale requirements . . . [and] the wording of each definitional section warrants non-restrictive interpretation of the concept of "sale" . . . 342 F.Supp. at 1289–90).

*See also SEC v. Addison,* 194 F.Supp. 709 (N.D.Tex.1961).

The Court, therefore, is of the opinion that plaintiff gave value for his interest in the Local 705 Pension Fund. Further, the Court is of the opinion that, contrary to SEC policy and defendants' assertion, plaintiff's acquisition of an interest in that Pension Fund was voluntary.

The employees must vote on the package negotiated by the union which makes a division of increased increment of income between salary and pension benefits. The Court is persuaded that few members would ever vote for an allocation to a pension increase in lieu of a greater salary increase if they knew at the time of the vote that they would have an eight percent or smaller chance of ever realizing any benefit from the increased pension allocation. The final decision of such allocation to pension rather than salaries is with the employees and they thereby make the contribution from the total wage package.

This decision to accept or reject the package is, furthermore, a voluntary one. The fact that a majority vote may prevail does not negate the fact that this majority decision is but an aggregate of many individual decisions. Moreover, the fact that individuals of a contrary mind may be bound by the majority decision does not mean that such individuals lack voluntary participation in the plan.

To the extent that SEC policy results in a conclusion that there is no voluntary purchase, the Court finds that it comports neither to logic nor economic reality. Such a policy in effect singles out purchasers of one type of security, i. e., a pension fund interest, for special scrutiny by looking into their subjective state of mind to ascertain the "voluntariness" of the purchase, and therefore, the existence of an "investment decision". In no other circumstance does the SEC look behind the purchase for the state of mind of the investor, to determine whether in fact the purchaser "desired" to make the purchase. The investment decision is presumed from the act. Likewise, it must be presumed here.

The Court, consistent with the rule of *Tcherepnin v. Knight* that form be disregarded for substance, finds that plaintiff gave value for his interest in the Local 705 Pension Fund, both in the form of services and a portion of his cash wages. This conclusion finds further support in the policy considerations alluded to in *Collins, supra.*

The Court makes no finding here beyond the narrow holding that the complaint alleges the sale of a security for purposes of application of the antifraud provisions of the Securities Acts, and that the complaint alleges violations of those provisions. The Court makes no finding with respect to applicability of any other sections of those Acts to employee pension plans such as the one here litigated.

## COUNT VI

Local defendants next argue that Count VI should be dismissed because it is barred by the statute of limitations and because this Court lacks federal sub-

ject matter jurisdiction under Section 302(c)(5) and (e) of the NLRA.

■ As a preliminary matter, local defendants assert that Local 705 should be dismissed as to this count because Section 302 contemplates relief only against the Pension Fund. The Court rejects that argument as without support or merit.

■ Local defendants next claim that any action against the Trustees is barred by the applicable Illinois statute of limitations. Although the issue of whether a state statute of limitations should be applied in a federal court suit under Section 302(e) has not been decided, state limitation periods have been applied in federal court suits under Sections 301 and 303 of the NLRA. *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Operating Engineers Union v. Fishbach & Moore, Inc.*, 350 F.2d 936 (9th Cir. 1965).

In *Hoosier* the Supreme Court held that the issue of timeliness in a Section 301 suit should be determined as a matter of federal law, by reference to the appropriate state statute of limitations. The Court stated that:

> characterization of the action for purposes of selecting the appropriate state limitations provision is ultimately a question of federal law. But there is no reason to reject the characterization that state law would impose unless that characterization is unreasonable or otherwise inconsistent with national labor policy. (383 U.S. at 706, 86 S.Ct. at 1113, 16 L.Ed.2d at 200).

After analyzing the six month statute of limitations found in Section 10(b) of the NLRA relating to unfair labor practice charges, the Court concluded that the provision reflected the federal goal of relatively rapid disposition of labor disputes.

Defendants argue that the same goal of prompt disposition of disputes should apply in a Section 302 action. With that standard in mind, they attempt to characterize the nature of the action. Defendants urge that because of the impor-

tance of these pension funds to many people, any challenge to the fund's structure should be made at the earliest time.

The parties discuss in their briefs the appropriate characterization of this action, so as to determine the proper period of limitations. In the opinion of this Court, this action could be characterized either as a breach of trust action or one to enforce a statutory right. In either event the five year period of limitations found in Ill.Rev.Stat. ch. 83, § 16 (1973) would apply, and this Court so holds. Notwithstanding that determination, regardless of how the action is characterized, it is not time-barred.

The essence of plaintiff's affidavit is that he had no actual knowledge of defendants' wrongful acts which are alleged in the complaint. For those reasons, more fully set out in the preceding discussion of the limitations question relative to Counts I and II, the Court holds that there is a genuine question of material fact as to whether plaintiff actually knew or should reasonably have known of the existence of facts giving rise to this cause of action.

Accordingly, defendants' motion to dismiss Count VI based on the statute of limitations is denied.

■ Local defendants next challenge this Court's jurisdiction to hear Count VI, which alleges a violation of Section 302(c)(5) of the NLRA requirement that all union pension funds shall be for the sole and exclusive benefit of the employees.

First, according to defendants, the interpretation and application of the "for the exclusive benefit of employees" provision is within the primary jurisdiction of the Internal Revenue Service which approved the plan and its amendments. Defendants argue that Local 705's service rule has been an integral part of the plan since its inception in 1955 and that it was considered and approved by the IRS in granting the Pension Fund's original qualification and exemption under Sections 401 and 501 of the Code. Section 401(a) of the Code, like Section

302(c)(5) of the NLRA contains a "for the exclusive benefit of" employees requirement. Therefore, argue defendants, Local 705 Pension Fund's exemption from income taxes immunizes its eligibility rule from suit under the NLRA via the doctrine of primary jurisdiction.

The Court dealt with and rejected a similar argument in the case of *Smith v. Peick,* No. 72 C 2968 (N.D.Ill., June 30, 1975). The Court rejects it here for like reasons as not warranting further discussion.

 Second, defendants argue that Count VI does not state a claim for relief under Section 302(c)(5). It must be noted at the outset that this same argument was presented to this Court in *Insley v. Joyce,* 330 F.Supp. 1228 (N.D.Ill. 1972). In that case Judge Will held that a pension fund's eligibility requirements may violate Section 302(c)(5) of the NLRA as not being for the "sole and exclusive benefit of the employees," at least to the extent of surviving a motion to dismiss for lack of subject matter jurisdiction or failure to state a claim.

He reasoned that the ambiguous language of Section 302 and its ambiguous legislative history supported the conclusion that a "structural" violation of Section 302(c)(5) occurred where a pension plan excludes "a sizeable number of union members, with no reasonable purpose behind their exclusion . . . ." Judge Will stated that the standard to be applied is whether the eligibility requirement is "arbitrary and capricious", a standard which "would appear to be litigable only in the Federal courts." 330 F.Supp. at 1233–34.

As an example of how such an eligibility requirement could violate the "exclusive benefit" provision of Sub-Section (c)(5), the Court hypothesized that the Local's pension fund's "break-in-service" rule:

> might primarily be designed to strengthen the union by encouraging employees to work only . . . [for contracting employers] and to penalize employees who work or who have worked for other truckers . . . . . If the purpose and effects behind this provision are thus primarily to benefit the union and penalize employees, we clearly are presented with a trust fund that possesses the structural deficiency of not being solely for the benefit of employees. (330 F.Supp. at 1234).

This Court adopted Judge Will's ruling in *Smith v. Peick, supra.*

Defendants argue that Judge Will was in error in that: (1) the legislative history makes it clear that Section 302(e) does not give federal courts jurisdiction over suits challenging trust fund eligibility provisions; (2) the decisional law does not support a finding that an eligibility provision constitutes a structural violation of Section 302; (3) the *Mine Workers Pension Fund* cases do not support the *Insley* holding; (4) the "sole and exclusive benefit of employees" provision is a traditional state law fiduciary concept; and (5) an eligibility provision which encourages longevity of service with contracting employers and thereby indirectly encourages union membership is not unlawful as a matter of law. Defendants further rely on *Cuff v. Gleason,* 515 F.2d 127 (2nd Cir. 1975) as controlling authority.

The Court remains in agreement with Judge Will's ruling in *Insley* and this Court's ruling in *Smith v. Peick, supra.* The case of *Cuff v. Gleason, supra* does not require a contrary result. In *Cuff* the Second Circuit approved the language of the lower court which had held that:

> [Section] 302(c)(5) of the LMRA would not confer federal jurisdiction where an application of a trust pension plan rather than a collective bargaining agreement, (cite omitted) was involved *and the specific requirements of § 302(c)(5) are met* (cite omitted) (emphasis added) (515 F.2d at 128).

That section specifically requires that the trust fund be "established . . . for the sole and exclusive benefit of the employees of such employer."

The issue in *Cuff* as defined by the Court itself was "whether the applica-

tion of rules of a jointly-administered pension trust to an individual claim was arbitrary and capricious." 515 F.2d at 128.

Here plaintiff challenges not the misapplication of a rule which is itself proper, but the legality of the rule itself. Here, as in *Insley,* "plaintiff has alleged and put into controversy an exclusionary eligibility requirement (viz., the . . break in service rule) concerning the defendants' § 302 trust." 330 F.Supp. at 1233. *See also Lugo v. Employees Retirement Fund of the Illumination Products Industry,* 366 F.Supp. 99, 102 (E.D.N.Y.1973).

To the extent that *Cuff* stands for the proposition that a violation of Section 302 occurs only at the time of establishment of a rule and does not continue for as long as that rule is enforced, this Court declines to follow it. This Court adopts Judge Will's reasoning pertaining to Congressional intent and legislative history as the better reasoned view.

Defendants' motions to dismiss the complaint are denied in their entirety.