**John DANIEL, Plaintiff-Appellee,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, et al., Defendants-Appellants.**

**No. 76–1855.**

United States Court of Appeals, Seventh Circuit.

Heard April 4, 1977.

Decided Aug. 20, 1977.

Sherman M. Carmell, Chicago, Ill., Sidney Dickstein, George Kaufmann, Washington, D. C., Bernard Weisberg, Chicago, Ill., for defendants-appellants.

Peter J. Barack, Lawrence Walner, Chicago, Ill., for plaintiff-appellee.

Victor H. Kramer, Washington, D. C., William J. Kilberg, Mitchell L. Strickler, Dept. of Labor, Washington, D. C., Gerald M. Feder, Peter G. Nash, Washington, D. C., Harvey L. Pitt, S. E. C., Washington, D. C., for amicus curiae.

Before CUMMINGS and TONE, Circuit Judges, and JAMESON, Senior District Judge.*

CUMMINGS, Circuit Judge.

Plaintiff is a resident of Illinois and has been a member of defendant Local Union 705 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America since 1951. He also purports to serve as the representative of the class of all members of all affiliate locals of the Teamsters International who have "purchased and acquired an interest in a Teamsters' pension fund." The original defendants were Local 705, the International Brotherhood, three classes (Teamster local unions with pension funds similarly situated to Local 705, trustees of such pension funds and all officers of locals with such pension funds), and Louis Peick, an officer of Local 705 and a trustee of its pension fund. Additional defendants added by amendment are Local 705's Pension Fund and seven individuals representing that pension fund and all other Teamster pension funds.

According to the complaint, the Teamsters locals negotiate labor contracts with companies across the United States for the benefit of their members who are employees of such companies. Under these contracts, Teamster members agree to provide their services as employees of the companies in return for wages and various other forms of consideration. Since 1955, most of those labor contracts negotiated by the Teamsters have provided for the establishment of pension funds for their union members. Under the labor contracts, the employing companies make set payments into the pension funds for Teamster members "as part consideration for the labor services provided by such union members" (Complaint par. 12). These payments are held in trust and invested by pension trust fund trustees who are equally divided between employer and union representatives. Therefore, the Teamster member employees contribute their labor services in return for their participating interest in the pension trust funds and their wages and fringe benefits.

---

* The Honorable William J. Jameson, Senior District Judge of the District of Montana, is sitting by designation.

Again, according to the complaint, the Teamsters' pension plans do not differ *inter se* in any material respect for the purposes of this case. Each was a defined benefit pension plan where employees are offered various benefits if they meet certain eligibility requirements. Actuarial assumptions based on estimated union member turnover, mortality and the rate of return on fund capital are used to determine the amount the employer must contribute so that the pension fund will be able to pay the promised benefits to union members as they retire without jeopardizing the payment of benefits to future and antecedent retirees. The pension trust funds have lengthy vesting periods. If a Teamster member does not meet the length of service requirement of the vesting period, the entire contribution paid into the trust fund for him is forfeited, thereby extinguishing his interest in the fund. Local 705's pension fund had a twenty-year vesting period, a typical provision.

In addition to the lengthy plan-vesting periods, most of the Teamsters' pension plans require continuity of employment with employers who have entered into labor contracts with the Teamsters.[1] Under this continuity or "break-in-service" rule, no pension benefit is available to a Teamster union member who has been employed by covered employers for the full vesting period but whose employment with covered employers is not continuous and uninterrupted. Employer-paid contributions are also forfeited when the union member cannot meet the break-in-service requirement of his pension plan's vesting rule.

The monies contributed to the pension funds are invested by the trustees thereof, and it is alleged that each trust fund "over the long run [is] reasonably expected to grow through the accumulation of dividends, interest and other earnings" (Complaint par. 15). Failure to meet the length or continuity requirements of the pension fund's vesting provision also causes the forfeiture of a union member's participating interest in these accumulated earnings. When the complaint was filed in 1974, plaintiff had worked for covered employers for 22½ years, but his service was interrupted by an involuntary four-month break in service from December 1960 to April 1961.[2] Because of this interruption in service, Local 705 has refused to pay plaintiff any pension benefits whatsoever and the employer contributions paid on his behalf and the earnings accumulated therefrom had been forfeited.

Count I of the complaint asserts that beginning in 1955 and continuing to the present, defendants misrepresented certain material facts and omitted to make other material facts by making misleading statements which in general related to the value of a member's participating interest in his local pension fund. The misrepresentations concerned misleading statements as to the length and continuity requirements of the pension plan's vesting provision. Defendants are said to have made omissions of material facts by failing to inform the members that they would receive no pension benefits whatsoever if they did not meet the length or continuity requirements of the vesting provision and that, upon failing to satisfy these requirements, the contributions made on their behalf into the fund and the earnings accumulated therefrom would be forfeited. Defendants allegedly also omitted to state that the fund's

---

1. A survey of 32 pension plans representing over half of the Teamster membership disclosed no other plan which would have absolutely disqualified a man in Daniel's circumstances. Most plans have continuity requirements but involuntary breaks in service are usually remediable upon satisfaction of certain requirements. Local 705's continuity requirement has been so modified for a break in service occurring after 1970 (International Br. at 9 n. 12).

2. According to plaintiff's supporting affidavit, from April 1961 to July 5, 1961, his employer's bookkeeper embezzled the employer's contributions to the Local 705 Pension Fund. Plaintiff reported this embezzlement to Local 705. It subsequently treated his break in service as a seven-month interruption, although it had assured him at the time of his report to it about the lapse vis-à-vis his pension rights that it "would take care of whatever had to be done on account of the embezzlement" (App. 95a).

actuarial basis was arbitrary. Other omissions are said to be the failure to disclose pertinent information needed to disclose the actuarial basis upon which the funds were grounded and the actuarial likelihood that a union member will not receive any pension benefits at all. Finally, plaintiff alleged a failure to state that the defendants have unlawfully diverted pension funds for the benefit of persons other than the pension trust beneficiaries.

Plaintiff claims in Count I that although he purchased an interest in the pension fund by providing labor service to an employer with a labor contract with the Teamsters, he sustained substantial losses which were a direct and proximate result of a violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder by the defendants. Besides requesting class relief, plaintiff requested the district court to find that defendants violated Section 10(b) and Rule 10b–5 and to reform the pension fund agreements by deleting the length and continuity requirements of the vesting provision. The plaintiff also sought a judgment requiring defendants to pay pension benefits unlawfully withheld from plaintiff and his class. In addition, a judgment was sought in the amount of any interests which had been diverted from their proper purposes.

Count II of the complaint sought similar relief under Section 17(a) of the Securities Act of 1933. However, neither this nor any other count of the complaint charged that the registration requirements of that Act were applicable.[3]

*Plaintiff's Affidavit*

Four months after the docketing of his complaint, plaintiff filed an affidavit which we treat as part of the pleadings for purposes of our review of the order below denying the motion to dismiss. The affidavit showed that he had only an elementary school education and had joined Local 705 in April 1950 when he became a truck driver with an employer who had a collective bargaining agreement with that Union. He worked continuously as a truck driver with Local 705 contracting employers from April 1950 through November 1973, except for an interruption from December 5, 1960, until April 1961, when he was involuntarily laid off wholly because of the adverse economic condition of his employer.[4] Plaintiff tried unsuccessfully to find any trucker's work during this time period. He retired because of cataracts on December 1, 1973, at the age of 63. Since his retirement, Daniel has not worked at all.

In 1955, plaintiff learned of Local 705's pension fund and understood that as a Local 705 member he would be eligible to receive retirement benefits upon completing 20 years of employment with Local 705 covered employers. He believed that employer contributions to the Local 705 pension fund would finance the retirement payments which he would receive after 20 years of employment. This retirement plan was a material factor in his continuing employment with Local 705 covered employers. If he had known that Local 705 would interpret the pension plan as requiring uninterrupted service of 20 years, he would have sought employment elsewhere with an adequate retirement plan. The communications he received from Local 705 did not disturb his understanding that he would receive a pension after 20 years of employment with covered employers.[5]

---

3. The original complaint contained three additional counts, and a fourth was added by amendment on February 7, 1975. The plaintiff thereby seeks relief for the defendants' alleged breach of their duty of fair representation under Section 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. 159(a); and for the failure of the pension fund to be established for the "sole and exclusive benefit of the employees," as required by Section 302(c)(5) of the NLRA, 29 U.S.C. § 186(c)(5). Finally, the

plaintiff seeks to recover under common law theories of breach of fiduciary duty, fraud and deceit. Since they are not involved in this appeal, the additional counts will not be discussed further herein.

4. See note 2 *supra*.

5. Pension plan booklets describing pension plans are often designed "to sell the plan * * *," D. McGill, Fulfilling Pension Expectations 17 (1962) (Institute for Public Interest

In June 1971, plaintiff received a letter from defendant Peick stating that after 20 years of covered service and at 60 years of age or over, a retired employee would receive a monthly pension of $400. He expected to receive such a pension on his retirement. One of Local 705's booklets advised him that the purpose of the pension fund was to take care of him and his family in case of retirement and that the funds afforded protection to him, his wife and unmarried children under 18 years of age. He relied on such assurances that the fund would provide for financial security in his old age.

He did not learn until December 1973 that his involuntary 4-month layoff caused the Draconian result of total forfeiture of his pension. He never learned of the success or failure of the trustees' management of the Local 705 pension fund, nor was he advised of the type of investments being made by the trust fund. During several months prior to his December 1, 1973, retirement, he visited Local 705's office on five to eight occasions to arrange for his pension and was not then advised that he was ineligible to receive it. After Daniel's retirement, he was told for the first time that his 4-month involuntary break in service made him ineligible to receive any pension benefits. On December 26, 1973, and on March 28, 1974, he appeared before the Local 705 trustees, but they refused to reverse the prior denial of his pension. He and his fellow Local 705 members had always had the common understanding that they would receive a retirement benefit after 20 years of covered employment and that no employer contributions could be forfeited. Other members of Local 705 were shocked to learn that a Local 705 member with Daniel's record of employment could be denied all pension benefits because of a temporary break in service. Indeed neither the defendants nor the *amici* who support their position dispute that this is "unfair in the extreme, shocking to the conscience" (Secretary of Labor's Br. at 21).

Local 705, Peick and the International Brotherhood of Teamsters filed motions to dismiss Counts I and II of the complaint on the ground that the court lacked subject-matter jurisdiction and that they failed to state a claim upon which relief could be granted.[6] Local 705 and Peick also maintained that the action under Counts I and II was barred by the limitations provisions of the Securities Act of 1933 and the Illinois Statute of Limitations.[7] On March 1, 1976, the district judge handed down a memorandum opinion and order denying the motions to dismiss as to all counts and holding the anti-fraud provisions of the securities laws applicable. This opinion is reported in 410 F.Supp. 541. The effect of the opinion is to

Representation's Br. at 12.) For example, these materials do not forthrightly disclose in terms understandable to a truck driver with a limited education the "minimum length of time considered to constitute a break-in-service in the Local 705 Pension Fund 20 years continuous service vesting rule; such materials do not disclose that all contributions made on behalf of a Local 705 member into the Local 705 Pension Fund (and all accumulated earnings on the aggregate of such contributions) will be forfeited following any proscribed break in service; and such materials do not disclose either the actuarial bases on which the Local 705 Pension Fund has been established or the likelihood that any Local 705 member will ever receive a pension benefit" (Pl. Br. at 5).

Indeed, one *amicus* siding with defendants admits that this lack of disclosure is rampant generally in the pension field:

"Thus employees are often not aware of the fact that the actual realization of benefits depends upon meeting certain benefit eligibility conditions, depends upon prudent management of the retirement fund, depends upon contributions by their employer sufficient to pay retirement benefits as they come due, and depends upon their employer remaining in business" (Erisa Regulations Industry Committee's Br. at 19–20).

6. Local 705 and Peick included additional defenses in their motion to dismiss as to Counts I and II as well as some defenses directed at the other Counts of the complaint. The International answered the complaint and subsequently filed a motion to dismiss Counts I and II only, based on an asserted lack of subject-matter jurisdiction and failure to state a claim.

7. On appeal, the limitations defense has been abandoned.

require defendants, when offering a defined pension plan to a member, to disclose the actuarial probability, here perhaps as low as 8% (410 F.Supp. at 551), that a member actually will receive pension benefits, and factors such as risk of loss, breaks in service, death before retirement age, and plan termination, that can cause this member to be deprived of his benefits, or otherwise defendants must face fraud liability under the securities acts. Subsequently, the court entered an order denying defendants' motions to reconsider its refusal to dismiss Counts I and II but certified their application for interlocutory appeal under 28 U.S.C. § 1292(b). The certification was limited to Counts I and II of the complaint. The controlling question of law certified to this Court can be easily identified by the district court's careful circumscription of its holding below with respect to Counts I and II, *viz.:*

> "The Court makes no finding here beyond the narrow holding that the complaint alleges the sale of a security for purposes of application of the anti-fraud provisions of the Securities Acts, and that the complaint alleges violations of those provisions. The Court makes no finding with respect to applicability of any other sections of those Acts to employee pension plans such as the one here litigated." 410 F.Supp. at 553.

Thereafter we granted permission to appeal.[8] Three *amici curiae* have filed briefs urging reversal and four urge affirmance.[9] We affirm.

8. The district court has not yet ruled upon plaintiff's and defendants' respective motions for class action certification.

9. Those favoring affirmance are the Securities and Exchange Commission (SEC), the Gray Panthers, the Institute for Public Interest Representation (IPIR) and the Teamsters for a Democratic Union. Opposed are the Secretary of Labor, the Erisa Regulations Industry Committee (ERIC) and the National Coordinating Committee for Multiemployer Plans. The General Counsel of the SEC and a representative of the Secretary of Labor participated in the oral argument.

10. Section 10(b) provides:

## Modality of Analysis

The securities cases in the Supreme Court's 1976 October Term have underscored its recently expressed methodology in interpreting the securities laws. See *e. g., Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124; *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480. Analysis begins with the relevant statutes themselves. After a study of their language and any court-added gloss, attention shifts to the statutes' legislative history. Additional considerations weigh in the balance. The history of the SEC's administration of the securities laws often can add a substantive gloss of its own which is entitled to the usual administrative deference (*Investment Company Inst. v. Camp,* 401 U.S. 617, 626–627, 91 S.Ct. 1091, 28 L.Ed.2d 367) so long as it does not become law-making. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 212–214, 96 S.Ct. 1375, 47 L.Ed.2d 668. And to the extent that these more cogent interpretive tools are not dispositive of the statutes' meaning, additional considerations of policy may tip the scales. *Id.* at 214 n.33, 96 S.Ct. 1375; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 44 L.Ed.2d 539. We shall use this methodology in our analysis of this case.

## Statutes

Both of the major anti-fraud portions of the federal securities laws are relied upon in this complaint. Count I charges a breach of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) [10] and Rule 10b–5 thereunder (17 C.F.R. § 240.10(b)–

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

(5) [11] while Count II alleges a violation of Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)).[12] This being an appeal from an order denying a motion to dismiss, the allegations concerning the use of the jurisdictional means and the making of material misrepresentations, the omissions to state material facts or the use of manipulative or fraudulent devices are treated as true by defendants. Their argument is based upon the phrase "in connection with the purchase or sale of any security" in Section 10(b) and Rule 10b–5 and the phrase "sale of any securities" in Section 17(a). Defendants assert that these anti-fraud provisions are inapplicable on their face on the ground that plaintiff's interest in the pension fund is not a "security" and was not acquired by him in a "sale."

### Plaintiff's Interest in the Pension Fund Is a "Security"

The term "security" is defined in Section 2(1) of the 1933 Act (15 U.S.C. § 77b(1)) [13] and in Section 3(a)(10) of the 1934 Act (15 U.S.C. § 78c(a)(10)).[14] In each statute, the definition of "security" includes any "investment contract." [15] Since the same Congress which passed both the 1933 and 1934 Acts clearly indicated that its definition of

---

**11.** Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

**12.** Section 17(a) provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

**13.** Section 2(1) of the 1933 Act provides:

"When used in this title, unless the context otherwise requires—

(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." (Emphasis supplied.)

**14.** Section 3(a)(10) of the 1934 Act provides:

"When used in this title, unless the context otherwise requires—

(10) The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." (Emphasis supplied.)

**15.** Plaintiff does not seriously press the theory that he had a "certificate of interest or participation in any profit-sharing agreement" but rather relies on the "investment contract" theory. Since we find merit in the "investment contract" theory, we have no occasion to express a view on the adequacy of the "certificate" theory under the facts of this case where Daniel has no document which evidences his interest in the Local 705 Pension Fund.

"security" in the 1934 Act was intended to be " 'substantially the same * * *' " as in the 1933 Act, cases construing either definition can be used interchangeably. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 44 L.Ed.2d 621; *Tcherepnin v. Knight,* 389 U.S. 332, 336, 342, 88 S.Ct. 548, 19 L.Ed.2d 564. Therefore we need not break out separate lines of analysis in order to determine the existence of a security under Section 10(b) of the 1934 Act and Section 17(a) of the 1933 Act.

■ In construing the statutory term "security," guidance is provided by two overriding principles. First, as remedial legislation the securities acts should be construed broadly to effectuate their purposes. Congress purposely defined the term "security" broadly, and it has been construed liberally by the Supreme Court in order to protect the public from speculative or fraudulent schemes. *Tcherepnin v. Knight,* 389 U.S. 332, 336, 338, 88 S.Ct. 548. Secondly, in searching for content in the term "security," "form should be disregarded for substance and the emphasis should be on economic reality." *Id.* at 336, 88 S.Ct. at 553.

■ With this background, attention can now focus on whether plaintiff's interest in the Teamsters' pension fund is an investment contract. An investment contract was defined by the Supreme Court in *SEC v. W. J. Howey Company,* 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 27, to mean

"a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."

In *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2060, the Supreme Court reiterated this rule and stated that

"[t]his test, in shorthand form, embodies the essential attributes that run through all of the Courts' decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."

* * * * * *

"What distinguishes a security transaction [from every other form of commercial dealing] is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use." *Id.* at 858, 95 S.Ct. at 2063.[16]

As demonstrated below, the elements of the *Howey* rule are present here, for under the Local 705 Pension Fund, money is invested in a common enterprise, the management of which is committed to a third party, and from which profits and income are reasonably expected.

*The Union Member as an Investor*

In the present case, the money invested in the pension fund came from employer contributions paid on behalf of the employee. The local defendants maintain that non-contributing beneficiaries of a fund cannot be conceptualized as investing in the fund, citing *SIPC and SEC v. Morgan, Kennedy & Cox, Inc.,* 533 F.2d 1314 (2d Cir. 1976). In *Morgan, Kennedy,* the Second Circuit was asked "to determine whether the one hundred and eight employee-beneficiaries of a trust created under a profit-sharing plan qualify as 'customers' of a bankrupt broker-dealer for the purpose of receiving compensation for losses available to such customers under the Securities Investor Protection Act of 1970 (SIPA), 15 U.S.C. § 78aaa *et seq.*" *Id.* at 1315. The statutory definition of "customer" read in pertinent part "persons (including persons

---

**16.** The International's argument that a union member is not an investor "in any sense understood by Congress when it was protecting investors in the securities markets" (Br. 12) is addressed *infra.*

with whom the debtor deals as principal or agent) who have claims on account of securities *received, acquired* or *held* by the debtor from or for the *account of such persons* * * *" (emphasis supplied). *Id.* at 1316. Prior Second Circuit law had used investor and customer status interchangeably. *Id.* at 1317. In *Morgan, Kennedy* it was the trust as an entity as represented by the trustees, rather than its beneficiaries, who were the customers of the debtor broker-dealer. The account was held in the trustees' names and the individual beneficiaries' identities were totally unknown to the broker-dealer. Moreover, control over investment decisions was exercised exclusively by the trustees. "The employee-beneficiaries * * * made no purchases, transacted no business, and had no dealings whatsoever with the broker-dealer in question respecting the trust account." *Id.* at 1318. Common sense mandated the conclusion that the individual beneficiaries were not customers of the broker-dealer. Because of the *sui generis* definition of customer/investor under the Securities Investor Protection Act of 1970, *Morgan, Kennedy* is irrelevant to the question whether the union members have made an investment within the meaning of the 1933 and 1934 Acts.

More relevant is the recent case of *Klamberg v. Roth,* 425 F.Supp. 440 (S.D.N.Y. 1976). There the court held that the plaintiff as beneficiary in an employee pension plan had standing to bring an anti-fraud action against the plan trustees:

> "Fraud perpetrated by a trustee in the purchase or sale of securities on behalf of the trust has a tangible impact on each beneficiary, no matter how many benefi-

ciaries are thereby affected and regardless of the precise purposes of the trust. The policies behind the *Birnbaum* rule are not undermined * * *" *Id.* at 443.[17]

The employer contributions to the plan's pension fund constitute a sector of the total employee compensation structure. *Inland Steel Co. v. National Labor Relations Board,* 170 F.2d 247 (7th Cir. 1948), certiorari denied, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112. "Regardless of the form they take, the employer's share of the cost of these plans or the benefits the employers provide are a form of compensation." Welfare and Pension Plans Disclosure Act of 1958, S.Rep. No. 1440, 85th Cong., 2d Sess. (1958), reprinted in 3 U.S. Code Cong. and Admin. News pp. 4137, 4139. This thesis is accepted by the courts, see, *e. g., Lewis v. Benedict Coal Co.,* 361 U.S. 459, 469, 80 S.Ct. 489, 4 L.Ed.2d 442; *Employing Plasterers' Assoc. v. Journeymen Plasterers' Protective and Benevolent Soc'y,* 279 F.2d 92, 99 (7th Cir. 1960), and the commentators alike. P. Drucker, The Unseen Revolution 8, 34 (1976); Note, Legal Problems of Private Pension Plans, 70 Harv.L.Rev. 490, 494 (1957). Indeed the International Brotherhood has conceded[18] these pension funds "constitute a form of compensation for an employee's labor" (Br. 12).[19] Realistically speaking, employers are putting money into a fund for an employee's future use which he would otherwise be getting in his paycheck. Mundheim and Henderson, Applicability of the Federal Securities Laws to Pension and Profit-Sharing Plans, 29 Law & Contemp. Prob. 795, 803–804 (1964).

---

**17.** *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir. 1952), certiorari denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356, confined recoveries under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder to buyers and sellers of securities.

**18.** In the district court, the International Brotherhood did not challenge that an "investment contract" was involved here. Even now all the defendants agree that "the SEC has consistently taken the position that interests in some pension plans are "securities" (Joint Rep. Br. at 2).

**19.** The International Brotherhood argues that the employee, once employed, has no individual control over either the fact or amount of the contributions to the fund. Such issues of investment autonomy are best addressed in the context of the existence of a sale. Consequently we defer the bulk of our discussion on these issues until our discussion of whether a sale of an instrument found to be a security can be said to have occurred.

The International maintains that employees do not even have an interest in the pension plan except in the attenuated sense that they have a contingent expectancy of receiving pension payments at a future date. But mere contingent expectancies are the rule rather than the exception in the equity markets. Profits in an equity security require that the market value plus accrued dividends of a stock be greater than the stockholder's cash basis. Thus profits are contingent on the successful operation of the common enterprise, there the issuing corporation. Whether an employee is found to have covered employment before his benefits vest or a stockholder is forced to sell his stock at a net loss does not eject his interest in the respective common enterprises from the bounds of the *Howey* definition of security. Realizing this analogy is not exact, we think that a right to receive benefits, received as a form of compensation and not subject to unilateral withdrawal by the pension trustee or the employer, is a sufficient interest to constitute a security, even though it will only mature upon the happening of certain events in the future.

The Local defendants attempt to erect a dichotomy between wages *per se* and the fringe benefits of employment which together make up an employee's total compensation by referring to sections of the Bankruptcy Act, the Internal Revenue Code, the Social Security Act, the Fair Labor Standards Act and the Sherman Act which purportedly raise such a distinction for the purposes of those Acts. The existence of a wage/compensation dichotomy in other unrelated statutes is wholly irrelevant to whether a union member has made an investment under the *Howey* rule. The *Howey* test only requires that the employer-paid contributions to the pension fund can be properly considered to be economic compensation to the employee. This proposition is universally accepted by the courts and commentators. Accordingly, the investment of money prong of the *Howey* rule has been satisfied.[20]

*The Pension Fund as a Common Enterprise*

Under *Howey*, it is "immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." 328 U.S. at 299, 66 S.Ct. at 1103. As a result, the common enterprise can properly take the form of a trust fund investing in the capital markets where the beneficiaries' common relationship with the enterprise is an undivided interest in such a trust without the beneficiaries having certificates evidencing their interest or the power to transfer their interests in the trust. See *Collins v. Rukin,* 342 F.Supp. 1282, 1286 (D.Mass.1972). Presumably, an investor who purchases a minority block of stock from a close corporation whose shares have restraints on their alienation may still sue for fraud under the securities laws. *Holdsworth v. Strong,* 545 F.2d 687 (10th Cir. 1976) (*en banc*) Here the enterprise is common to all of the Local 705 members. The pension fund trustees self-admittedly exercise exclusive control over the common enterprise and the investment of its assets. The pension fund which receives the union members' investments is a common enterprise under *Howey.*

*Profits from the Efforts of Others*

The Local defendants point principally to *United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621, in arguing that the pension fund does not generate profits in the *Howey* sense.[21] In *Forman,* profits were defined as follows:

> his money in the hope it, through the management of others, can fund his retirement.

---

**20.** The International makes the overly facile analogy to *Forman, supra,* that just as the "shareholders" in *Forman* decided whether to live in a particular place, the union members made the decision whether to work for a Teamster shop. It is clear that the union member does not intend to purchase a commodity or realty for personal use; rather he parts with

**21.** Defendants do not contest that whatever is expected from the common venture will be solely derived from the efforts of persons other than the venture's investors.

"By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in *Joiner* [*S. E. C. v. C. M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88] (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin v. Knight, supra* (dividends on the investment based on savings and loan association's profits). In such cases the investor is 'attracted solely by the prospects of a return' on his investment. *Howey, supra,* 328 U.S. at 300, 66 S.Ct. [1100] at 1103." *Id.* at 852, 95 S.Ct. at 2060.

It is conceded that the expected payout to a beneficiary will exceed the contributions made by the employer on the employee's behalf (the union member's investment). The resulting gain would commonly be termed a profit. Black's Law Dictionary. However, the Local defendants attempt to discredit this gain as a *Forman* "profit" because, on an amortized basis, some of the gain may be attributable to "pooled" contributions of all participating employers, forfeitures of employees whose pension rights do not vest or to increased contributions negotiated by the union.

Initially it may be noted that gain relative to a security can derive from sources other than the direct efforts of the managers of the common enterprise. In both *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974), and *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir. 1973), certiorari denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53, the gain present for any particular investor in those pyramid sales schemes had as its source a substantial fraction of the investment of another investor in the scheme. Similarly, the payout to

a maturing annuitant in *SEC v. Variable Annuity Life Ins. Co.,* 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640, was more likely to derive from investments of new annuitants than from a return on his original investment and the compounded income earned on it.[22] Moreover, realizing a profit from a non-transferable stock option given in exchange for services would depend upon the investor having enough money to exercise the option. *Collins v. Rukin,* 342 F.Supp. 1282 (D.Mass.1972). Yet in all of these cases the investor's interest was still characterized as a security.

In any event, only a portion of the gain can even arguably derive from non-investment sources. A substantial part of the gain (which even defendants concede to be at least 25%, International Br. at 10–11) will derive from traditional return on the pension fund participant's investment, a dollar-profit element in the form of capital gains, interest, dividends, and other accumulated earnings realized from the trustees' management of the pension fund.[23] For example, the current weekly contribution to the Local 705 pension fund of $24 invested at the current maximum bank interest rate of 7½ percent per annum on a compounded basis generates a substantial sum of money. At this rate, over a 20-year career, almost $25,000 is invested and if earnings are accumulated on a tax-deferred basis pursuant to Section 401 of the Internal Revenue Code (26 U.S.C. § 401), the profit over capital contribution will be over $33,000. An increase of 1% in return on a pension fund's capital can allow benefits to be increased by 20% (SEC Br. at 11). It is precisely this promise of retirement benefits far in excess of the pensioner's investment that forms the economic inducement to invest in a pension fund.[24]

---

**22.** Both *Turner* and *Variable Annuity* were cited in *Forman.* The Supreme Court did not speak disapprovingly of either case. 421 U.S. at 852 n. 16 and 857 n. 24, 95 S.Ct. 2051.

**23.** That this profit element is fixed because pension payments are set at specific levels from time to time is wholly immaterial to gain being profit in the *Forman* sense. A number of instruments which all would concede to be se-

curities (bonds, debentures, etc.), are fixed return.

**24.** The district court also noted "there is no warranty that the trust will be able to fund the supposedly fixed benefits due to members of the plaintiff class". 410 F.Supp. at 551. This resulting risk was deemed to generate "risk capital" return under *Silver Hills Country Club v. Sobieski,* 55 Cal.2d 811, 13 Cal.Rptr. 186, 361

Recently the district court for the District of Columbia has decided that surviving spouses and dependents of deceased coal miners, who claimed a right to permanent health care coverage by the United Mine Workers, did not have an interest in the United Mine Workers of America 1950 Benefit Plan and Trust, which provides health benefits for active and retired miners, their families, dependents and survivors, that could be deemed to be a "security" under the 1933 or 1934 Acts. *Robinson v. United Mine Workers of America Health and Retirement Funds et al.,* 435 F.Supp. 245, (D.D.C.1977). Although conceding that the district court's opinion in *Daniel* was distinguishable from his case (435 F.Supp. at 246 n. 1), Judge Gesell in *dicta* disagreed with the reasoning of Judge Kirkland in *Daniel.*

The *Robinson* opinion was based squarely on the gloss *United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621, gives to the term "investment contract" appearing in the securities acts' definitions of "security." Judge Gesell's "reluctance" to find the *Robinson* plaintiffs' interest to be an investment contract was based entirely upon his view that *Forman* foreclosed such a result (435 F.Supp. at 246). *Robinson* is not applicable here.

In no sense could the spouses and dependents of the deceased coal miners in *Robinson* be viewed as investing in the fund since they contributed nothing to the employers in return for the employers' payment of per-tonnage royalties into the trust fund on behalf of and in return for the services of the union miners. The *Robinson* plaintiffs were donees instead of purchasers, so that the requisite *Blue Chip* sale (421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539) was lacking.

Unlike *Daniel,* where Local 705 members could affect the employers' payments into the pension fund or the allocation of contributions between pension fund payments and current wages by failing to ratify a

given contract with set contribution levels, the *Robinson* plaintiffs were powerless to increase or decrease payments or convert them to their personal use. Additionally, there was no expectation of profit in *Robinson,* because benefits were to be paid out of the employers' current contributions to the trust rather than depending on the fund's capital. In *Daniel,* however, funding of the benefit program was crucially dependent on profits from the investment of the fund capital. Further, all the assets of the pension fund not committed to pay out current benefits were invested at risk for profit.

Although the UMW Benefit Plan included retirement benefits for retired miners and lump-sum death benefits to their heirs, only the length of time health care coverage was to be extended to the plaintiffs was in issue in *Robinson.* That case therefore involved merely the consumption of "free" medical care rather than, as in *Daniel,* an actual dollar financial return on investment, *i. e.,* "an expectancy of dollar benefits," which the investor could then use to purchase anything he chose. 421 U.S. at 852–853, 95 S.Ct. 1917.

To declare the *Robinson* plaintiffs' interest in the benefit plan to be a "security" would indeed have required "a degree of creativity unwarranted by the realities of the transactions and the function and purpose of the securities laws" (435 F.Supp at 246). As already shown, to declare Daniel's interest to be a security does not require such an attempt "to stretch the securities laws beyond their traditional scope" (435 F.Supp at 247). Finally, the legislative history relied upon in *Robinson* concentrates on the registration provisions of the securities laws rather than the anti-fraud provisions, as discussed more fully *infra.*

### Economic Reality

■ The literal passage of the *Howey* test is only the first hurdle. The definition-

---

P.2d 906 (1961). Some doubt as to the validity of the risk capital approach exists. See *Forman,* 421 U.S. at 857 n. 24, 95 S.Ct. [2051] at 2063. Since traditional profits are present in our case, we need not explore the risk capital

theory beyond noting that pensioners are far from taking "no risk in any significant sense." *Id.; El Khadem v. Equity Securities Corp.,* 494 F.2d 1224 (9th Cir. 1974), certiorari denied, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146.

al sections herein involved are introduced with the phrase "unless the context otherwise requires." This context is, of course, economic reality in view of the surrounding factual circumstances. *Emisco Industries, Inc. v. Pro's, Inc.,* 543 F.2d 38 (7th Cir. 1976). As Mr. Justice Powell explained in *Forman* :

> "The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors. Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto. Thus, in construing these Acts against the background of their purpose, we are guided by a traditional canon of statutory construction:
>
> > " '[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' *Church v. the Holy Trinity v. United States,* 143 U.S. 457, 459 (1892)." 421 U.S. at 849, 95 S.Ct. at 2059.

If an interest is not a security in economic reality, abuses should be remedied by Congress rather than by an over-liberal extension of the securities laws. *Id.* at 859 n. 26, 95 S.Ct. 2051.

However, the economic inducement for plaintiff's interest in the pension fund was investment for a profit to provide wherewithal in his retirement. This plaintiff's interest in the fund embodies many of the significant characteristics typically present in the instruments concededly covered by the securities acts. *Id.* at 851, 95 S.Ct. 2051. Plaintiff has an undivided interest in the Local 705 Pension Fund consisting of the aggregate of all monies invested on behalf of Local 705 union members by covered employers for whom those members worked. Those monies are managed and invested by the pension fund trustees in stocks, bonds, mortgages and other investments for the sole benefit of Local 705 members. As such, the Local 705 Pension Fund resembles a mutual fund, *viz.,* a pool of money invested for the benefit of the mutual fund shareholder by the fund manager. The amount of payout to any particular member would depend upon his length of service in covered employment, the extent of funding in the plan and the monthly pension determined by the trustees. Their success in money management will be one of the most important factors in determining the amount of payout. A Local 705 member invests $1,248 per year through his employer contributions into that fund. Since an interest in a mutual fund is a security, the interest in a pension fund should also be considered a security. See, Testimony of SEC Commissioner Purcell. Hearings on Proposed Amendments to the Securities Act of 1933 and the Securities Exchange Act of 1934 before the House Committee on Interstate and Foreign Commerce, 77th Cong., 1st Sess. 895 (1941). Otherwise the trustees of private pension plans with annual employer contributions of $23 billion for the benefit of 30 million employees [25] will be able to mislead their beneficiaries with immunity from the antifraud provisions of the 1933 and 1934 Acts.

Not only is plaintiff's interest like an interest in a mutual fund, it is also like an interest in a variable annuity contract. Variable annuity contracts have been held to be securities within the securities laws. *SEC v. Variable Annuity Life Insurance Co.,* 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640; *SEC v. United Benefit Life Ins. Co.,* 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673. The securities in *VALIC* and *United Benefit* were investment vehicles designed to provide a return on capital upon retirement. Even though the annuity contract in *VALIC* contained several elements of traditional life insurance and although the flexible

---

**25.** Skolnick, Private Pension Plans, 1950–74, 39 Social Security Bulletin 34 (June 1976).

fund annuity in *United Benefit* contained a minimum insurance type guarantee, the Court separated the conventional life insurance attributes from the security involved. See, *e. g., United Benefit, supra,* at 207, 87 S.Ct. 1557. Similarly, the employment fringe benefit aspect of a pension can be separated from its security aspects. Plaintiff can be both an investor and employee. See, *e. g., SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 476 (5th Cir. 1974); *Collins v. Rukin,* 342 F.Supp. 1282 (D.Mass. 1972). As in *VALIC* and *United Benefit,* a Local 705 member is entitled to full disclosure of the material of the enterprise in which his money is put so that he can intelligently appraise the risks involved.

Reduced to fundamentals, economic reality mandates the realization of the immense importance of private pension plans to the American capital markets. As a Senate Report has disclosed:

"In 1940, an estimated four million employees were covered by private pensions; in 1950, the figure had more than doubled to 9.8 million; in 1960, over 21 million employees were covered; and in 1973, approximately *30 million workers participated.* Currently, *one-half* of the industrial work force in the United States are members and participants of private pension plans. It is projected that by 1984, 42.3 million workers will be covered by private pension plans. The growth of the assets owned or controlled by pension funds has closely paralleled this expansive growth. Total estimate assets of pension plans have accelerated from $2.4 billion in 1940 to *$150 billion in 1973* and are increasing at a rate projected to exceed $250 billion by 1980." (Emphasis added.) S.Rep. No. 93–127, 93rd Cong., 2d Sess. 2–3 (1973).

Because of favorable tax provisions and economies of scale, pension funds are the most efficient way for an employee to invest. N. Ture, the Future of Private Pension Plans 3 (1976). On a relative scale, his pension plan will probably be a Teamster member's largest investment. On an aggregate basis, private pension funds control a huge amount of the capital markets. At the end of 1972, they held 11% in value of all New York Stock Exchange listed stocks and in the same year they accounted for over 23% of the dollar value of all shares traded there. If the sole investment vehicles for tens of millions of Americans which in the aggregate control a quarter or more of the entire capital market are exempt from the anti-fraud provisions of the securities laws, then policing of the capital markets is significantly neutralized.

*Legislative History and SEC Interpretation*

Not only do the cases support considering this interest as an investment contract, but so do the legislative history and the SEC's interpretation of the securities acts. The legislative history of the 1933 and 1934 Acts themselves is silent on the question of pension plans. However, subsequent legislative action [26] and accompanying SEC interpretation [27] do provide a measure of guidance in construing the 1933 and 1934 Acts.

Thus in 1934, the Senate adopted an amendment to the 1933 Act to exempt from registration

"an offering made solely to employees of an issuer or of its affiliates in connection with a *bona fide plan for the payment of extra compensation* or stock-investment plan for the exclusive benefit of such employees". 78 Cong.Rec. 8708 (1934). (Emphasis supplied.)

The amendment was eliminated in conference in order to protect participants in such plans who

**26.** As to the significance of subsequent congressional expressions with respect to the meaning of earlier statutes, see *National Labor Relations Board v. Bell Aerospace Co.,* 416 U.S. 267, 274–275, 94 S.Ct. 1757, 40 L.Ed.2d 134; *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–381, 89 S.Ct. 1794, 23 L.Ed.2d 371.

**27.** As to the significance of subsequent SEC administrative practice with respect to the meaning of the securities laws, see *United States v. National Ass'n of Securities Dealers,* 422 U.S. 694, 725, 95 S.Ct. 2427, 45 L.Ed.2d 486; *Chemehuevi Tribe of Indians v. FPC,* 420 U.S. 395, 409–410, 95 S.Ct. 1066, 43 L.Ed.2d 279.

"may be in as great need of protection afforded by availability of information concerning the issuer for which they work as are most other members of the public." H.R.Rep. No. 1838, 73d Cong., 2d Sess. at 41 (1934).[28]

In 1941, SEC Commissioner Purcell commented on the 1934 rejection of the Senate amendment as requiring the SEC to interpret the 1933 Act as applying to employee pension funds which involve the sale of securities as "investment contracts."[29] In his view, this included any

"plan under which employees are given the opportunity to place part of their earnings in a fund which is to be invested for their benefit and returned to them at a later date * * *." 1941 Hearings at 895–896.

Commissioner Purcell also noted that the 1940 Congress was aware of the economic congruence between employee pension plans and ordinary mutual funds because it defined an "employees' security company" as one type of "investment company" in Section 2(a)(13) of the Investment Company Act of 1940. 1941 Hearings at 895. Conse-

quently, an employee pension plan is regulated by the 1940 Act unless it falls within an exemption from registration. See, e. g., 15 U.S.C. §§ 80a–3(c)(11) and –6(b).

Similarly, the opinion of the Assistant General Counsel of the SEC in 1941 was that "security" within the definition of the 1933 Act included employee pension plans.[30] More recently, former Chairman Cohen of the SEC also has testified on the basis of his own expertise as to the common understanding of a number of institutional investors that interests in a pension plan fall within the definition of a security in the 1933 Act.[31] Like Commissioner Purcell, he explained that is why they had to be specifically exempted from the Investment Company Act of 1940 (15 U.S.C. § 80a–3(c)(11)). Additionally, he commented on the similarities between a pension fund and a mutual fund investment. Accordingly, Professors Mundheim and Henderson have characterized the SEC's interpretation of "security" as used in the securities laws as including an interest in employee pension plans as that "traditionally taken."[32]

---

**28.** Since the 1934 Act was passed by the same Congress that passed the 1933 Act, this legislative history is tantamount to being actual 1933 Act history and should be credited accordingly. *Techerepnin v. Knight,* 389 U.S. 332, 336, 342, 88 S.Ct. 548, 19 L.Ed.2d 564.

Recently, class action suits against employee profit-sharing plans have charged that the managers of these plans have failed in their responsibilities by investing too much in the employer's own stocks. Employees Wrath Hits Profit-Sharing Plans, Bus. Week, July 18, 1977 at 25.

**29.** Hearings on Proposed Amendments to the Securities Act of 1933 and the Securities Exchange Act of 1934 before the House Committee on Interstate and Foreign Commerce, 77th Cong., 1st Sess. 895–896 (1941) (1941 Hearings).

**30.** Opinion of Assistant General Counsel of SEC [41–44 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 75,195 (1941).

**31.** Hearings on S. 3598 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92 Cong., 2d Sess. 231 (1972). In those hearings, Mr. Cohen included Ch. VII of the Summary Volume of the SEC's 1971 *Institutional Investor Study* which states that interests of participants in employee pen-

sion plans meet the definition of security in the 1933 Act. See also Interim Report, Senate Committee on Labor and Public Welfare S.Rep.No. 92–634, 92d Cong., 2d Sess. 96 (1972). The defendants concede the SEC has treated interests in pension funds as securities since 1971 (Rep. Br. at 5).

**32.** Mundheim and Henderson, Applicability of the Federal Securities Laws to Pension and Profit Sharing Plans, 29 Law and Contemp. Prob. 795, 811 (1964). The defendants and some *amici* rely on comments by Congressman Wolverton, a member of the House Committee that reported the 1933 and 1934 Acts, sitting on the Committee before which Commissioner Purcell was testifying, that he did not believe Congress intended to regulate pensions under the securities laws. 1941 Hearings, at 870–871, 878, 888, 913. Although the 1934 Congress did not specifically focus on pension funds, the 1934 abortive Senate amendment does show Congress did have some forms of employee security plans in mind. Certainly, the definition of security adopted is broad enough to include the plans.

Moreover, the statements by Congressman Wolverton deal with "supervision" or "regulation" under the 1933 Act, *viz.,* registration. But as we show in the opinion, the registration

Congress has evidenced agreement with the SEC's position that interests in pension funds are securities by way of the Investment Companies Amendments Act of 1970. Recognizing that interests in employee pension funds are "securities," in 1970 Congress decided to exempt them from the registration requirements of Section 5 of the 1933 Act (15 U.S.C. § 77e) if the employee pension fund was maintained by a bank or in a separate account maintained by an insurance company (15 U.S.C. § 77c(a)(2)(A)).[33] This exemption was to codify the long established administrative practice of the Commission in exempting certain pension funds from the registration requirements of the 1933 Act. H.R.Rep. No. 91–1631, 91st Cong., 2d Sess. 31 (1970). U.S.Code Cong. & Admin.News 1970, p. 4897, 4943. A similar exemption amendment was provided with respect to the 1934 Act. 15 U.S.C. § 78c(a)(12).[34] This action

provisions of the 1933 Act do not apply to securities consisting of interests in pension plans. It might be that a realization of this fact will calm concerns about undue "regulation of employee benefit plans." Statement of Representative Dent, 174 D.L.R. at A–6 (BNA, Sept. 7, 1976).

**33.** The exemption comprehends, in pertinent part:

"Except as hereinafter expressly provided, the provisions of this title shall not apply to any of the following classes of *securities*:

 * * * * * *

"any interest or participation in a single or collective trust fund maintained by a bank or in a separate account maintained by an insurance company which interest or participation is issued in connection with (A) a stock bonus, pension, or profit-sharing plan which meets the requirements for qualification under section 401 of Title 26, or (B) an annuity plan which meets the requirements for the deduction of the employer's contribution under section 404(a)(2) of Title 26, *other than* any plan described in clause (A) or (B) of this paragraph (i) the contributions under which are held in a single trust fund maintained by a bank or in a separate account maintained by an insurance company for a single employer and under which an amount in excess of the employer's contribution is allocated to the purchase of securities (*other than interests or participations in the trust or separate account itself*) issued by the employer or by any company directly or indirectly controlling, controlled by or under common control with the employer or (ii) which covers employees some or all of whom are employees within the meaning of section 401(c)(1) of Title 26. The Commission, by rules and regulations or order, shall exempt from the provisions of section 77e of this title any interest or participation issued in connection with a stock bonus, pension, profit-sharing, or annuity plan which covers employees some or all of whom are employees within the meaning of section 401(c)(1) of Title 26, if and to the extent that the Commission determines this to be necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by

the policy and provisions of this subchapter." (Emphasis supplied).

**34.** The 1934 Act provision provides:

"The term 'exempted security' or 'exempted securities' includes—

"any interest or participation in a collective trust fund maintained by a bank or in a separate account maintained by an insurance company which interest or participation is issued in connection with (A) a stock-bonus pension, or profit-sharing plan which meets the requirements for qualification under section 401 of Title 26, or (B) an annuity plan which meets the requirements for the deduction of the employer's contribution under section 404(a)(2) of Title 26, other than any plan described in clause (A) or (B) of this paragraph which covers employees some or all of whom are employees within the meaning of section 401(c)(1) of Title 26; and such other securities (which may include, among others, unregistered securities the market in which is predominantly intrastate) as the Commission may, by such rules and regulations as it deems necessary or appropriate in the public interest or for the protection of investors, either unconditionally or upon specified terms and conditions or for stated periods, exempt from the operation of any one or more provisions of this chapter which by their terms do not apply to an 'exempted security' or to 'exempted securities.' "

This provision specifically exempts only interests in collective trust funds while the 1933 Act exemption includes interests in single funds. However, the final clause of the exemption quoted above gives the SEC plenary authority to exempt other securities from the reporting requirements of the 1934 Act. The comments of the General Counsel of the SEC speaking for the Commission in argument before us suggest the SEC in the exercise of this power has decided that interests in pension funds are "exempted securities" under the 1934 Act.

However, under the 1933 Act the SEC's interpretative and quasi-legislative powers are limited by Section 3(b) which provides "no issue of securities shall be exempted under this subsec-

of course shows that Congress considered such pension funds to be securities that would not be exempt from registration absent the 1970 Amendments. Therefore, if the Local 705 Pension Fund is being maintained by a bank,[35] the interests involved here would be securities exempt from registration. However, exemption from registration and reporting requirements does not mean exemption from Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act and Rule 10b–5 thereunder, as the House Committee on Interstate and Foreign Commerce realized in its report.[36] See also 15 U.S.C. § 77q(c).

Defendants and the *amici* who support their position seek to downplay the importance of the 1970 Amendments by arguing that the 1970 exemption relates only to the sale of interests in certain bank collective trust funds and insurance company separate accounts for pension funds, claiming that the sale to employees of interests in the underlying pension fund is entirely outside the scope of the 1970 Act. However, these arguments relate to legislative history concerning an earlier version of the Act which referred only to "collective" trust funds. A close study of the legislative history shows that the version of the Act which was finally adopted contemplated the interests sold to employees in the underlying pension fund.

The principal stimulus for the amendment to the 1933 Act in 1970 was to settle the legal status of certain commingled investment accounts maintained by banks and insurance companies.[37] As a result the early versions of the bill only exempted:

> "any interest or participation in a *collective* trust fund maintained by a bank or in a separate account maintained by an insurance company which interest or participation is issued in connection with * * * a stock bonus, pension, or profit-sharing plan which meets the requirements for qualification under section 401 of the Internal Revenue Code of 1954" (emphasis added).

See, e. g., S. 34, 91st Cong., 1st Sess. 65 (1969), reprinted in S. Comm. on Banking and Currency, *Analysis of S. 34,* 91st Cong., 1st Sess. 119 (1969). After the Senate passed a bill containing this language, the General Counsel of the Sperry-Rand Corporation wrote a letter to the House Subcommittee considering the legislation, pointing out that the bill did not exempt interests in single trust funds. Hearings Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 91st Cong., 1st Sess., Part 2 at 929–931. His suggestion was to add the language "or any employees' stock bonus, pension or profit-sharing trust" after "separate account maintained by an insurance company."

In response to this suggestion, the Subcommittee reported out a bill with the added phrase "single or" to precede the phrase "collective trust fund maintained by a

---

tion where the aggregate amount at which such issue is offered to the public exceeds $500,000" (15 U.S.C. § 77c(b)). Accordingly, in order to achieve exempted status for securities such as interests in pension funds under the 1933 Act, Congress could not rely on SEC administrative practice being binding as it could under the 1934 Act. Thus the wording differences between the 1933 and 1934 Act represent a need to codify the administrative practice under the 1933 Act.

**35.** A large portion of Local 705's Pension Fund is maintained by the trust departments of major Chicago banks. See note 61, *infra.* Plaintiffs represent that "because most employee pension plans are bank maintained, registration is not required for most employee pension plans" (Pl. Br. at 37–38).

**36.** Report of the House Committee on Interstate and Foreign Commerce on the Investment Company Amendments Act of 1970. H.Rep. No. 91–1382, 91st Cong., 2d Sess. 10, 43 (1970).

**37.** "Banks maintaining these collective funds would solicit money from various institutional investment vehicles, including pension funds, and would promise to commingle the funds to take advantage of the economies of size that could be gained in the securities market and the investment expertise of the bank's analysts. Since an interest in such collective funds held by an individual pension fund is a security and the bank collective fund an investment company, efforts were made to exempt this security from the registration provisions of the Securities Act and the collective fund from the Investment Company Act." (SEC Br. 32 n.40).

bank." This version, later passed by the House, thereby altered the focus of the exemption to encompass interests in the underlying pension funds. The Conference Report went along with the House version:

"The Senate bill exempted from the registration requirements of the 1933 Act certain collective trust funds maintained by a bank or in a separate account maintained by an insurance company.

"The House amendment would have codified a long established administrative practice of the Commission by making it clear that this exemption applied not only to collective trust funds, but also to single trust funds.

"The conference agreement follows the House version." H.R.Rep. No. 91–1631, 91st Cong., 2d Sess. 31 (1970), U.S.Code Cong. & Admin.News 1970, p. 4947.

Two subsequent changes in the language of the exemption show the shift to include interests in the underlying plans. Although the Conference Committee generally adopted the House version, it did include a small modification. Since the House provision exempted interests in all pension funds, it was contrary to the SEC's administrative position that non-registration of pension interests did not apply in all situations. In particular, the SEC required registration where an amount in excess of the employer's contribution to a pension fund is allocated to the purchase by the fund of securities issued by the employer. In order to conform the exemption, a provision was included to exclude the above situation from exemption. *Id.* at 24.

This exclusion generated another legislative fillip. The exclusion applied when the excess was used to purchase securities issued by the employer. Since interests in pension funds are themselves securities, the exclusion could potentially be interpreted to require registration of all pension plans where any money is contributed to the pension plan directly by employees, since they could be conceptualized as buying securities.[38] Accordingly, Section 3(a)(2) of the

1933 Act was amended one week after the passage of the 1970 Amendments to make it clear that the term "security issued by the employer" did not include the securities consisting of the interests in the pension fund. See 116 Cong.Rec. 40608 (Dec. 9, 1970).

Therefore the 1970 Amendments show that Congress intended to conform the 1933 Act to the SEC's administrative view that, although interests in pension funds did not need to be registered in most cases, they are nonetheless securities. See 116 Cong.Rec. 33287 (Sept. 23, 1970). When conjoined with the above-detailed legislative history and SEC interpretation, the 1970 Amendments provide substantial support for the proposition that an interest in an employee pension fund is a security.

*Policy*

Perhaps the main reason that pension plans are not specifically mentioned in the legislative history of the 1933 and 1934 Acts themselves is the fact that in the early 1930's pension plans were still a rarity. In the early decades of the 20th century, only 38% of invested capital was invested indirectly, and of this amount only $\frac{1}{10}$ of 1% was invested in pension funds. By 1962, the indirect sector of the capital markets had jumped to 83% and pensions constituted 27% of this amount. Hearings Before the Subcommittee on Fiscal Policy, U.S. Cong. Joint Economic Committee, 91st Cong., 2d Sess. 17–18 (1970). Since 1955, the asset value of pension plans has exceeded the total accumulated by the other three major institutional investors: mutual funds, life insurance companies and property and liability insurance companies. We are informed by an *amicus curiae* that the book value of private pension plan assets is $216.9 billion, the largest single source of private investment capital in the economy.

Because employee pension plans are now the major, if not sole, form of investment for most American workers to provide for their old age and because of the now crucial

---

**38.** "In particular, there was concern that where an insurance company maintained a separate account to fund pension benefits for its own employees, interests in such an account might be considered securities issued by the employer" (SEC Br. 34 n.44).

role that such plans play in today's capital markets, they are just the sort of investment vehicle that the securities acts were passed to regulate. To proclaim that the securities laws encompass securities consisting of interests in pension plans is "quite consistent with the congressional enactment and with the role of the federal judiciary in interpreting it * * *." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539. The type of fraud allegedly perpetrated on the plaintiff is among those the securities laws were passed to prevent and remedy.

Of course, the normal scheme of the securities acts require registration as well as providing anti-fraud remedies. However, as demonstrated above, the 1970 Amendments codified the SEC's practice of exempting pension funds from the registration requirements of the 1933 Act. Thus declaring an interest in a pension fund to be a security will not subject any plans to registration which are not already so subject. Consequently, since the anti-fraud provisions do not impose an undue burden on anyone, they should be available to employees to remedy fraud. Mundheim and Henderson, *supra,* at 814. The proper inquiry then is not whether interests in employee pension plans are securities but rather why such a vital investment vehicle should be nevertheless excluded from the protection of the securities laws. We now turn to this inquiry.

*Plaintiff's Security Was Acquired in a "Sale"*

■ Defendants maintain that even if the plaintiff's interest is a security, his cause of action is defeated because he did not acquire it in a sale.

The 1933 Act defines "sale" as including "every * * * disposition of a security or interest in a security, for value" (15 U.S.C. § 77b(3)).

and the 1934 Act defines "sale" as including "any contract to sell or otherwise dispose of" (15 U.S.C. § 78c(a)(14)). Accordingly, in both Acts, a "sale" of an interest in a pension fund depends upon whether there has been a disposition of it. Here plaintiff acquired an interest in the Local 705 Pension Fund, and as shown, that interest is a security. Therefore, there necessarily has been a disposition of a security to plaintiff within the scope of the two Acts. The 1933 Act also requires that the disposition be "for value." Here plaintiff's giving of his services and the employer's contribution on behalf of the employee constitutes value, thereby meeting the "for value" requirement. See S.Rep. No. 1440, 85th Cong., 2d Sess. 4 (1958), U.S.Code Cong. & Admin. News, p. 4137. From the employee's viewpoint, the contributions to the pension fund are part of his compensation and the value flows from him to that extent.[39] From the employer's viewpoint, the contribution flows from the employer, constituting a part of the employee's compensation package. In either event, value has been given for a security, so that erection of a direct-indirect dichotomy is unwarranted. *SEC v. Harwyn Industries Corp.,* 326 F.Supp. 943, 954–955 (S.D.N.Y.1971, Mansfield, J.); see also *Hector v. Wiens,* 533 F.2d 429, 431–433 (9th Cir. 1976); *cf. Pete v. United Mine Workers,* 170 U.S.App.D.C. 1, 517 F.2d 1275, 1287 (D.C.Cir.1976).

**39.** Union spokesmen for both the United Auto Workers and the Teamsters have testified that pensions are deferred wages which are given high priority in collective bargaining. As to the UAW, see Hearings before the Senate Subcommittee on Private Pension Plans of the Committee on Finance, 93d Cong., 1st Sess. 467 (1973). As to the Teamsters, see Hearings before the Special Subcommittee on Labor, House Committee on Education and Labor, 87th Cong., 1st Sess. 225 (1961). This was the recurrent theme emerging from the ERISA [Employment Retirement Income Security Act] hearings as well:

"An important theme which emerged from Subcommittee hearings related to the basic

dichotomy in the rationale for a pension plan. Repeatedly, witnesses volunteered testimony that they regarded their pension benefits as deferred wages. Since labor negotiations resulting in wage increases through collective bargaining invariably include some consideration of pension benefits, employees believe that had pensions not been included in the settlement package, they would have received higher wage commitments." S.Rep. No. 92–634, Interim Report of Activities of the Pension Welfare and Pension Plan Study, 1971, 92d Cong., 2d Sess. 75 (1972).

The defendants maintain there is a controlling conceptual distinction between "non-contributory" plans and plans where the employee first receives cash and then pays over such cash into the pension fund. We refuse to subscribe to undue literalism. An employee's performance of services satisfies the for value requirement of the 1933 Act. See *Collins v. Rukin,* 342 F.Supp. 1282 (D.Mass.1972); *SEC v. Addison,* 194 F.Supp. 709 (N.D.Tex.1961); *Lawrence v. SEC,* 398 F.2d 276 (1st Cir. 1968); see also *Truncale v. Blumberg,* 88 F.Supp. 677 (S.D.N.Y.1950); *Hector, supra,* at 432. Recent SEC interpretations also support the view that an interest in a non-contributory plan is gained for value. *Oklahoma National Gas Co.* [71–72 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 78,583 (1971); *Allis-Chalmers Corp.* [72–73 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 78,-803; *Keene Corp.* [71–72 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 78,475; *Missouri Research Laboratories, Inc.* [72–73 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 79,036.

■ Defendants argue that there can be no sale because the contribution to the pension fund is compulsory. However, the definitions of "sale" in the 1933 and 1934 Acts do not require volition. In any case, volition is present to the extent that Local 705 members voted whether or not to accept the collective bargaining contract containing this pension fund and whether to ratify subsequent agreements governing the level of employer contributions into the fund or seek dismissal of union officers or the unlikely radical measure of decertification of the Union.[40] Similarly, in the corporate merger context (where a vote by the shareholders to merge is binding notwithstanding any individual shareholder's vote to the contrary), cases under the anti-fraud provisions have held that a sale occurs where there is no voluntary action by the alleged purchaser. *Vine v. Beneficial Finance Co.,* 374 F.2d 627, 635 (2d Cir. 1967); *Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795 (2d Cir. 1973); *International Controls Corp. v. Vesco,* 490 F.2d 1334 (2d Cir. 1974), certiorari denied, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236. The volition argument in a no-sale conclusion in the merger context, which was used only in the registration milieu, was derived from SEC Rule 133 (33 C.F.R. § 230–133 (1964)) but it was rescinded in 1972. In rescinding that rule, the Commission characterized that rationale as "only correct in the formalistic sense" in that it "overlooks the reality of the transaction." As the SEC pointed out, the "corporate action * * * is not some type of independent fiat, but is only the aggregate effect of the voluntary decisions made by the individual stockholders * *." 37 Fed.Reg. 23631, 23632 (Nov. 7, 1972). To like effect, the Local 705 Pension Fund contributions are not an independent employer fiat but rather represent the aggregate effect of the union members.

Also, plaintiff's affidavit shows that he would not have worked for a Local 705 covered employer if he had been advised about the continuous nature of the 20-year requirement before receiving a pension. When an employee decides to retain his job, his decision results in his continuing to give value in the future and in his further acquisition of interests in the pension fund.

---

40. The Teamsters maintain that a local whose constitution requires member ratification of pension plan agreements such as 705's is a rarity. Be that as it may, in our mobile society, an employee will be faced with a number of employment decisions during his career, and as he ages, such shifts will be more and more affected by the pension plan offered by a prospective employer. Accordingly, an employee may be faced with a meaningful decision even in the case of a compulsory plan whether to acquire interests in the pension fund. See Note, *supra,* 70 Harv.L.Rev. at 494. Needless to say, this construct does not render the individual employee a party to the bargain with the employer in the technical labor law sense. In this sense, the Union remains the exclusive agent.

*Amicus* ERIC suggests that if ratification is the doctrinal reed upon which a finding of volition is hung, unions will quickly eliminate ratification votes. First, we have shown that volition can exist even if ratification does not. But in any event, volition is not necessary for a sale under the securities acts. Even in a worst-case analysis, movement away from contract ratification would probably be limited. Elimination would require constitutional amendment which would presumably be difficult to achieve, requiring, in effect, a vote to weaken union democracy.

In its brief as *amicus curiae,* the SEC has persuasively shown why it formerly reached a different result for the purposes of the 1933 Act's registration provisions in the case of plans that are either non-contributory or compulsory. It was reasoned that there was no sale involved for a non-contributory plan because there was no direct investment of money by the employee, consistent with the then current legal view that the employer's contributions were gifts. Although the SEC recognized that an individual had a choice whether to become or remain an employee, it was thought that the choice would never turn on representation concerning the pension plan.[41] Therefore compulsory plans were not considered to involve sales. Testimony of Commissioner Purcell, 1941 Hearings at 896–897; Opinion letter of the Assistant General Counsel of the SEC, 1 CCH Fed. Sec.L.Rep. ¶ 2105.53; Testimony of Chairman Cohen, Hearings on Amendment No. 438 to S. 1659 Before the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., part 3, at 1326 (1967). See also 3 SEC Institutional Investor Study 980 quoted in Rep. Br. at 7–8.

These positions were never taken as to the anti-fraud provisions and are no longer viable even as to the registration provisions because non-contributory pensions are no longer viewed as a mere gift. Even though the Commission had in the past applied a no-sale rule to pension trusts as to the registration requirements of the 1933 Act, that rule was not administratively and should not be judicially applied to the anti-fraud provisions of both Acts. *SEC v. National Securities, Inc.,* 393 U.S. 453, 465–466, 86 S.Ct. 564, 21 L.Ed.2d 668. The purposes of the registration and anti-fraud provisions differ (*The Exchange National Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1139 (2d Cir. 1976)), so that a narrow view of "sale" would be most inappropriate as to fraudulent activity. *Collins v. Rukin,* 342 F.Supp. 1282, 1287–1288 (D.Mass.1972). Since "sale" as used in the two securities laws is not limited to transactions covered by the commercial law of sales but is to be broadly construed in view of the need for anti-fraud protection,[42] we conclude that the present disposition to plaintiff falls within the definitions of sale in the two statutes. See *Dasho v. Susquehanna Corp.,* 380 F.2d 262, 266–267, 269 (7th Cir. 1967).[43]

*Section 17(a) of the 1933 Act Creates a Private Cause of Action*

■ It is now well settled that Section 10(b) of the 1934 Act and Rule 10b–5

---

**41.** This is invalid in our case because Daniel's affidavit reveals material reliance on pension benefits in retaining his job. Moreover, now that pension benefits have become such an important part of the total wage package, this conclusion has little, if any, general application. See S.Rep. No. 1734, Welfare and Pension Plan Investigation, 84th Cong., 2d Sess. 11–13 (1956); Hearings before the Special Subcommittee on Labor, House Committee on Education and Labor, 87th Cong., 1st Sess. 32 (1961); Hearings before the Subcommittee on Labor, Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess. 99 (1972). Pensions are second only to wages as a reason for membership rejection of settlement proposals and are well ahead of such factors as vacations, hours and overtime, working conditions and seniority. Simkin, Union Membership Rejection of Contract Settlements, Labor Relations Yearbook 332, 342 (IPIR Br. at 13).

**42.** As one industry spokesman has testified: "The magnitude of the investment employers make in pension benefits for employees, encourages the tendency to present the plan in the most positive terms possible so that a return in positive employee attitudes can be realized on the investment. This leads to over simplification and an advertising sales approach. When, as is so often the case, the communication material is prepared by persons not thoroughly cognizant of the technical and legal nature of plan provisions, the result can easily become a document subject to criticism as incomplete and misleading." Testimony of Ernest Griffes on behalf of the American Society for Personnel Administration, Hearings before the Subcommittee on Labor, Senate Committee on Labor and Public Welfare, 93d Cong., 1st Sess. 765 (1973).

**43.** *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 on which defendants rely, reaffirmed the *Birnbaum* rule (note 17 *supra*) that liability under Section 10(b) of the 1933 Act and Rule 10b–5 requires a purchaser and seller. It does not weaken our holding in *Dasho* that "sale" in the securities laws is a comprehensive term not to be narrowly construed. Similarly, *Alabama Power Co. v. Davis,* 431 U.S. 581, 97 S.Ct.

give rise to a private right of action for the breach of its substantive terms. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730–731, 95 S.Ct. 1917, 44 L.Ed.2d 539. The existence of a private right of action under Section 17(a) of the 1933 Act is not as universally admitted. *Id.* at 733 n. 6, 95 S.Ct. 1917. Since we proceed on the assumption that the operative provisions of the anti-fraud sections of the 1933 and 1934 Acts are identical for the purposes of this lawsuit, the validity of our unitary analysis requires that we deem Section 17(a) of the 1933 Act as creating a private action under the facts of this case.

As a preliminary matter, Judge Kirkland rejected Local 705's and Peick's argument that Section 17(a) of the Securities Act of 1933 does not create a private cause of action, 410 F.Supp. at 546. In the court below and in its principal brief here, no argument was presented by the International Brotherhood as to the existence or nonexistence of a private cause of action under Section 17(a). The language of Section 17(a) (15 U.S.C. § 77q(a)) is certainly broad enough to imply such a right. In fact, Section 17(a) is more specific than Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) under which private rights of action have been commonly approved. See *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539. Accordingly, in

another opinion by the same district court as below, Judge McGarr also held that Section 17(a) impliedly calls for a private right of action. *Local 734 Trust v. Continental Illinois National Bank & Trust Co.,* [73–74 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,- 565 at 95,963 (N.D.Ill.1974). After noting that various courts have expressly recognized the existence of such a remedy while others have assumed it, the *Local 734 Trust* court concluded "there seems to be little practical value in denying the existence of a private action under § 17 once [as here] it is established that a plaintiff has an action under § 10(b) of the 1934 Act." [44]

In *Surowitz v. Hilton Hotels Corp.,* 342 F.2d 596, 604 (7th Cir. 1965), reversed on other grounds, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807, we first assumed there was a private cause of action under Section 17(a), for Judge Major stated "[t]he plain language of that Section convinces us that any cause of action arising under that Section is a right of the person injured by the acts and practices therein proscribed." In *Schaefer v. First National Bank of Lincolnwood,* 509 F.2d 1287, 1293 (7th Cir. 1975), this Court squarely held that Section 17(a) permits a private cause of action, stating:

"Since [as here] fraud as well as negligence has been alleged and the section 10(b) claim established, plaintiffs' section 17 claim will be allowed to stand." [45]

In Local 705's main brief before us, the Section 17(a) point is only mentioned in passing (Br. 21). Similarly, in their joint

---

2002, 52 L.Ed.2d 595, is not contrary to the opinion below. That case merely categorizes pension plans as a compensation for length of service rather than for daily services rendered as required under the prevailing conceptualization on employee rights given returning veterans under the Military Selective Service Act. Although *Hurn v. Retirement Trust Fund,* 424 F.Supp. 80 (C.D.Ca.1977), and *Wiens v. International Brotherhood of Teamsters,* BNA Sec. Reg. and L.Rep. No. 397 at A–13 (C.D.Ca.1977) (where the district judge gave his ruling from the bench), support defendants, neither contains an in-depth discussion and we respectfully decline to follow them.

44. For similar rulings by the court below, see *Freed v. Szabo Food Service, Inc.,* [61–64 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 91,317 (N.D.Ill.1964); *Schaefer v. First National Bank*

*of Lincolnwood,* 326 F.Supp. 1186, 1190 (N.D. Ill.1970), affirmed in this respect, 509 F.2d 1287, 1293 (1975); *contra, Reid v. Mann,* 381 F.Supp. 525, 526–528 (N.D.Ill.1974), noting the divergence of opinion on the subject.

45. In *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1283–1284 (2d Cir. 1969), certiorari denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93, the Second Circuit decided there was a cause of action under Section 17(a) because there was "little practical point in denying the existence of an action under § 17 once it is established that an aggrieved buyer has a private action under § 10(b) of the 1934 Act." The court cited many authorities upholding a private right of action for a violation of Section 17(a).

reply brief, defendants do "not particularize with respect to the non-applicability of [Section 17(a)]" (Reply Br. 8 n. 19). Defendants there observed that the 1933 Act relates to the initial issuance of securities and the 1934 Act relates to the resale market and then reasoned that Section 17(a) is the only anti-fraud provision even possibly applicable here.[46] Finally, the reply brief states that defendants "raise but do not argue the absence of an implied right of private action under Section 17(a)" (*ibid.* n. 9). In sum, defendants either do not contest or only weakly contest the existence of a private right of action under Section 17(a) where a "sale" of a "security" is present. Having decided that the definitions of a "sale" and "security" have been met by this complaint, we reaffirm *Schaefer* and therefore hold that Section 17(a) permits Count II to proceed.[47]

*The Anti-fraud Provisions of the Federal Securities Laws Have Not Been Preempted by ERISA*

 The defendants [48] and the *amici* who support their position urge that the Employee Retirement Income Security Act of 1974 (ERISA) has repealed the anti-fraud provisions of the 1933 and 1934 Acts insofar as they apply to union pension funds. Since we have concluded that the securities laws apply to a union member's interest in his pension fund, pre-emption may only be declared in the face of an explicit repealer provision or the most cogent repugnancy between the securities and pension regulatory schemes. Cf. *Gordon v. New York Stock Exchange,* 422 U.S. 659, 682–683, 95 S.Ct. 2598, 45 L.Ed.2d 463. Neither of these triggering conditions for pre-emption of the securities laws is present in this case.

Section 514(d) [49] of ERISA (29 U.S.C. § 1144(d)) is a general savings clause which provides that ERISA shall not be construed to supersede any federal law or rule thereunder. At the same time, Congress preserved state securities laws (29 U.S.C. § 1144(b)(2)(A)) in Section 514(b)(2)(A) [50] and they generally do not exempt pension interests from their anti-fraud provisions.[51] Thus ERISA's own savings clause by its

---

**46.** As Judge Friendly has noted, "*courts have shrunk from a literal reading that* would extend the reach of the statutes beyond what could reasonably be thought to have been intended in these two great pieces of legislation and *would produce a seemingly irrational difference in the scope of their anti-fraud provisions.*" *Exchange Nat. Bank, supra,* at 1133. (Emphasis supplied.) Here the security is plaintiff's interest in the pension plan. These interests generically arose when the pension plan was first formed for the benefit of Local 705 members. This was the primary distribution of the securities. Since Daniel was a member of Local 705 at this time, he has standing to sue for fraud in the primary distribution under Section 17(a) of the 1933 Act. Each year Daniel paid more value into the fund and from time to time plan amendments were effected which Daniel claims contributed to his being defrauded. This is the conceptual predicate for finding a secondary distribution under Section 10(b) of the 1934 Act.

**47.** In *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790 (7th Cir. 1977), we found it unnecessary to decide whether a private right of action exists under Section 17(a) when it is not accompanied by a viable Rule 10b–5 claim (at 795). Where, as here, the Section 17(a) count

accompanies a viable Rule 10b–5 count, *Sanders* requires proof of *scienter* under Section 17(a) (at 795).

**48.** In the court below, the International Brotherhood conceded that ERISA does not exempt "employee pension plans from the Federal Securities Laws, either expressly or by implied repeal." International's Sup. Memo. in support of Its Motion to Dismiss at 4 (Oct. 9, 1975).

**49.** Section 514(d) provides in pertinent part: "Nothing in [ERISA] * * * shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States * * * or any rule or regulation issued under any such law."

**50.** Section 514(b)(2)(A) provides in pertinent part: "[N]othing in this title shall be construed to exempt or relieve any person from any law of any State which regulates * * * securities."

**51.** The Illinois Securities Law of 1953 defines a security, for our purposes, in terms identical to the federal acts. 1975 Ill.Rev.Stat. Ch. 121½, Section 137.2–1. Pension interests are covered by the definition since "securities issued by or

own terms strongly suggests that pre-emption was not intended.

The defendants attempt to counter the statute's explicit terms by arguing that since it was universally believed pension funds were outside the scope of the securities acts, Congress saw no need to explicitly exempt a truism. But see *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 416 n. 20, 437, 88 S.Ct. 2186, 20 L.Ed.2d 1189. Defendants strain for support in the legislative history of the various pension regulatory acts. But all of the sources cited by the defendants [52] support only the proposition that

> "Pension and profit sharing plans are exempt from coverage under the Securities Act of 1933 (15 U.S.C. 77 *et seq.*), unless the plan is a voluntary contributory pension plan and invests in the securities of the employer company an amount greater than that paid into the plan by the employer. A voluntary contributory plan is one to which both the employee and the employer contribute and in which employees voluntarily participate. If the plan's investment in the employer's securities exceeds the employer's contribution, both the employer's securities and the interest in the plan must be *registered* under the Securities Acts with the SEC."

Interim Report of the Private Welfare and Pension Plan Study, 1971, S.Rep. No. 92–634 of the 92d Cong., 2d Sess. 96 (emphasis supplied).

Herein lies the defendants' quintessential error. They confuse the requirements of the 1933 Act's registration provisions with the anti-fraud provisions of the 1933 and 1934 Acts. The registration provisions are designed to assure that investors will be furnished with all material information concerning an informed investment decision. The mechanism to implement this objective includes filing of a registration statement and the delivery of a prospectus containing detailed information about the security and its issuer. In contradistinction, the anti-fraud provisions do not establish an affirmative disclosure system requiring the filing of documents. Rather the anti-fraud provisions are essentially a generalized self-executing prohibition against fraudulent activity. There is no invitation "to create a federal common law governing the management of pension plans." *Lugo v. Employers Retirement Fund,* 529 F.2d 251, 255 (2d Cir. 1976), certiorari denied, 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88.

The fact that the SEC has historically advocated [53] a hands-off approach to the

pursuant to * * * employee pension trusts or plans" are freed from registration requirements. 1975 Ill.Rev.Stat. Ch. 121½, Section 137.30. A similar definition of security and exemption from registration is included in the Uniform Securities Act which has been adopted in 32 jurisdictions. 7 Uniform Laws Ann., Uniform Securities Act §§ 501(1) and 402(a)(11) (1970) and Cumulative Annual Pocket Part at 342 (1976).

**52.** S.Rep. No. 1440, 85th Cong., 2d Sess. reprinted in 3 U.S.Code Cong. & Admin.News p. 4145 (1958); Welfare and Pension Plans Investigation, Hearings before the Senate Subcomm. on Labor and Public Welfare, 84th Cong., 1st Sess. 943–945 (1955); S.Rep. No. 1734, 84th Cong., 2d Sess. 57, 69 (1956); 3 U.S.Code Cong. & Admin.News, 93d Cong., 2d Sess. pp. 4649, 4863 (1974); *id.* at 4641–4643, 4840–4842, 4847. See *Mundheim* and *Henderson, supra,* at 837.

**53.** The Senate Report on the 1958 pension act explained:

> "Serious consideration was given earlier to placing the administration of the bill with the

Securities and Exchange Commission on the basis of its past experience in the administration of disclosure type legislation. However, as the official representatives of the Securities and Exchange Commission clearly indicated that they did not feel they were the proper agency to handle the administration of this type of legislation, and as they felt that the taking on of this function might interfere with their presently established functions, this consideration was abandoned."

S.Rep. No. 1440, 85th Cong., 2d Sess., reprinted at 3 U.S.Code Cong. & Admin.News, pp. 4137, 4156 (1958). See also 1957 Hearings at 107, 119. The SEC's decision not to accept a regulatory role to enforce disclosure of material investment information was largely based on the conclusion that:

> "Inasmuch as welfare and pension plan beneficiaries generally have no individual choice as to the securities to be purchased by a welfare or pension fund, the type of meaningful information to be furnished to them as to the management, investments and transactions of their funds may involve quite differ-

regulation of pension plans with respect to disclosure requirements holds no brief for exempting pension plans from the anti-fraud provisions of the securities acts. Nor does the fact that ERISA provides for disclosure of a plethora of information after its effective date of January 1, 1975,[54] and that it heavily regulates the pension industry *ipso facto* dictate that pension funds should enjoy a blanket exemption from the anti-fraud sections. Although banks and life insurance companies are subject to stringent regulation, bank securities and insurance variable annuities and flexible funds are subject to the anti-fraud rules of the securities acts, even though they are sometimes exempt from the registration regulations of the acts. *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564; *SEC v. Variable Annuity Life Insurance Co.,* 359 U.S. 65, 87 S.Ct. 1557, 18 L.Ed.2d 673; *SEC v. United Benefit Life Ins. Co.,* 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673; *SEC v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668.

Reading the anti-fraud provisions of the securities laws to be complementary to the requirements of ERISA makes good sense. The requirements of ERISA do not substitute for the protections afforded by the anti-fraud provisions because the securities laws require that all material facts, including, of course, risk of loss, be disclosed prior to the investment decision (*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757) while ERISA disclosure limits itself to the plan provisions [55] without a particularizing of how or how likely benefits may be lost (ERISA Section 102 (29 U.S.C. § 1022)) and may be made 90 days subsequent to the investment commitment.[56] ERISA Section 104(b)(1)(A) (29 U.S.C. § 1024(b)(1)(A)). Defendants have not shown that ERISA would provide relief to persons who have acquired an interest in a pension fund where false or misleading representations have been made at inception or during subsequent ratifications or upon a job offer.[57] Affirmance of the judgment below will supplement ERISA by pro-

ent criteria from those presently employed by the Commission under the various Federal Securities Acts." *Id.* at 119.

The SEC did not apparently object to being given plenary jurisdiction over individual retirement accounts. ERISA Leg. Hist., Vol. III at 4605. Nor was the Congress that enacted ERISA unaware that the SEC considered interests in pension funds to be securities under the 1933 Act unless excepted. See note 31 *supra.*

**54.** It should be noted that the defendants concede that certain voluntary and contributory pension plans are subject to both the securities laws' registration requirements and ERISA (Rep. Br. 206). The securities laws apparently have not torpedoed such plans. This seems to follow from the continuing registration of such plans. In fact, the disclosure requirements are becoming complementary as the SEC in its revisions of Form S–8 attempts to avoid duplication of, but not defer to the ERISA requirements. Form S–8, Sec. Act Release No. 33–5488 (1974), CCH Fed.Sec.L.Rep. ⁋ 7197; Sec. Act Release No. 5767 (Nov. 22, 1976), [76–77 Transfer Binder] CCH Fed.Sec.L.Rep. ⁋ 80,809; *SEC v. Garfinkle* [74–75 Transfer Binder] CCH Fed.Sec.L.Rep. ⁋ 95,020 (S.D.N.Y.1975).

**55.** ERISA has other *post-hoc* disclosure times. Thus the amended provisions of a pension plan need not be disclosed until after adopted ERISA Section 104(b)(1)(B) (29 U.S.C. § 1024(b)(1)(B)) and then only summaries of

the changed provisions are given until five years later when they must be incorporated into the integrated plan summary. In the establishment of a new plan, disclosure can occur within four months of adoption. *Id.*

**56.** Circumscribing the utility of ERISA disclosure further are the widespread disclaimers of liability for incorrect plans description or analysis which are contained in most post-ERISA summary plan description booklets. Under Section 14 of the 1933 Act and Section 29 of the 1934 Act, waivers of liability regarding securities are ineffective. See *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168; *Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 558 F.2d 831 (7th Cir. 1977).

**57.** Moreover the denial of pension benefits to John Daniel occurred before the effective date of ERISA. Section 502(a) of ERISA, 29 U.S.C. § 1132(a), provides a right of action for a pension fund beneficiary "to obtain * * * appropriate equitable relief * * * to redress * * * violations" of any provision of Title I of ERISA ("Protection of Employee Benefit Rights"), 29 U.S.C. §§ 1001–1144. However, there is no provision of Title I which generally prohibits the making of false or misleading representations to an employee concerning the pension fund.

viding a self-executing compulsion to disclose adequate information at such times, including a statistically determinable risk that many employees covered by a plan will never receive their pension benefits.[58] Thus the anti-fraud provisions of the securities acts will protect the interests of an investor before he makes an investment decision, while ERISA serves employees who have been employed for a substantial period of time at a job covered by a pension plan, protecting them from losing benefits through ignorance of the plan provisions. Consequently, we conclude it would be unwarranted to impute an intent on the part of Congress for ERISA to override the federal or state securities laws, *SEC v. Garfinkle* [74–75 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 95,020 (S.D.N.Y.1975), where protections offered by ERISA do not fully overlap those of the anti-fraud provisions of the securities acts. *Cf. Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192.

Judge Kirkland's disposition is not repugnant to the regulatory scheme outlined by ERISA. Although the defendants assert any remedy given plaintiff would contravene Section 203(b)(1)(F) of ERISA (29 U.S.C. § 1053(b)(1)(F))[59] because that Section permits pension plans to disregard non-forfeitable years of service before the September 2, 1974, effective date of that statute if, as here, the employee would not have been entitled to benefits because of a break in continuous service under his pension plan, the district court can fashion relief to avoid a conflict with ERISA if plaintiff should prevail on the merits. Judge Kirkland has not, contrary to ERISA, held defendant's twenty-year continuous service rule invalid. His opinion merely holds that it and other essential matters had to be disclosed, and defendants will doubtless attempt to show at trial that plaintiff was aware of that and other key requirements.

*Effect on Labor-Management Relations*

 Even if ERISA does not exempt pension plans from the securities acts, it is argued that a resultant devastating effect on labor-management relations in and of itself should require an exemption in the absence of specific inclusory language in the securities acts. But holding the anti-fraud provisions to be applicable here will not destroy labor-management relations as defendants and the *amici* who support their position insist, for the anti-fraud provisions only probe fraudulent conduct such as the making of false or misleading representations. They do not require any complex filings. Moreover, most pension plans have been specifically exempted from the registration requirements of the 1933 Act. 15 U.S.C. § 77c(a)(2)(A). Since a sale triggering the anti-fraud provisions would normally occur when an employee decides to accept or continue in a job, the holding below would not be disruptive of the collective bargaining process. Indeed, the application of the anti-fraud provisions of the securities laws should enhance federal labor policy by augmenting the unchallenged statutory

---

**58.** "ERISA § 102(b) (29 U.S.C. § 1022(b)) requires that summary plan descriptions include a statement of 'circumstances which may result in disqualification, ineligibility, or denial or loss of benefits.' In theory, employees should be able to infer from this information in the plan description that there is a risk of loss, and perhaps the nature of that risk. The Department of Labor has interpreted the statutory language very narrowly, however, in proposed rules issued on June 9, 1975, 40 Fed.Reg. 24654, on which the Department has stated plan administrators may rely. 41 Fed.Reg. 16957 (April 23, 1976). Plan administrators are permitted to describe the benefits of the plan in positive language, leaving the employee to deduce the negatives implicit in the affirmative language" (IPIR Br. at 21 n *)

**59.** Section 203(b)(1)(F) provides:

"(b)(1) In computing the period of service under the plan for purposes of determining the nonforfeitable percentage under subsection (a)(2) of this section, all of an employee's years of service with the employer or employers maintaining the plan shall be taken into account, except that the following may be disregarded:

"(F) years of service before this part first applies to the plan if such service would have been disregarded under the rules of the plan with regard to breaks in service, as in effect on the applicable date."

right of workers to be fairly represented by their union (Local 705 Br. 14 n. 31; 29 U.S.C. § 185; *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842). And as *amicus* Gray Panthers point out, such an application will further the purpose of Section 302(c)(5) of the Labor Management Relations Act (29 U.S.C. § 186(c)(5)) by letting each employee know to what he is entitled under a union pension fund. 2 NLRB, Legislative History of Labor Management Relations Act of 1947, 1305 (1948). The only negative effect on unions *qua* unions will be in preventing them from defrauding their rank and file with impunity. See *Walsh v. Schlecht,* 429 U.S. 401, 410, 97 S.Ct. 679, 58 L.Ed.2d 641.

In sum, Congress has nowhere provided that the anti-fraud provisions of the securities acts should not apply to pension funds. The Secretary of Labor's arguments that affirmance will undermine a union's authority as exclusive bargaining agent for its employees vis-à-vis the employer or will disrupt the bargaining process are specious. Of course a finding of liability implies nothing about the entirely separate and not uncomplicated question of the form of relief which is a matter for the trial court, and the construction of formulae giving the measure of damages is for the trial court in the first instance. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 24 L.Ed.2d 593; *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 241 (2d Cir. 1974). Furthermore, as *amicus* Institute for Public Interest Representation has shown, current employees need not be

disadvantaged because of the generous amortization and waiver provisions contained in Sections 302, 303 and 304 of ERISA (29 U.S.C. §§ 1082–1084). It is for the district court to construct a remedy which properly balances the needs of plaintiff against those of other fund participants.

### The Parade of Horribles

The parade of horribles offered by defendants and the *amici* who support their position (including their predictions of $200 billion liabilities) results mainly from their zeal as advocates and should not distract a court from enforcing the Congressional policies contained in the anti-fraud provisions of the securities laws.[60] Finally, we wish to emphasize that we are not holding the registration requirements of the 1933 Act or the reporting requirements of the 1934 Act to be applicable to these pension funds.[61] We do not require the filing of any document or establish judicial control over pension fund operations. There should be no undue burden caused by the type of disclosure the anti-fraud provisions would encourage because all of the material information will be readily available to the plan trustees since their actuaries needed all of the information in order to set up the plan in the first place.

Moreover, plan liability, given the fact that employees' interests in pension funds are covered by the anti-fraud provisions of the securities acts, is still limited by a number of factors. Particular employees must show, in light of all the ambient circum-

---

**60.** See *Northern Securities Co. v. United States,* 193 U.S. 197, 351–352, 24 S.Ct. 436, 48 L.Ed. 679 (plurality opinion).

**61.** Because of the longtime and consistent administrative practice, these pension funds might be deemed beyond the scope of the registration requirements even if they are not already exempted by 15 U.S.C. § 77c(a)(2)(A). The SEC maintains 96% of all pension plans are so exempted apparently because most funds, including Local 705's, are invested by the trust departments of major banks. (Hansen Ex. 1, App. 184a at 14–15):

"There is only one affirmative condition— qualification under Section 401 of the Internal Revenue Code—that a pension plan must

meet in order to qualify for this exemption. It has been estimated that 96% of pension plans satisfy this condition. See S.Rep. No. 92–1150, 92d Cong., 2d Sess. 110 (1972). There is also a negative condition; the exemption is lost if the plan invests an amount greater than the employer's contributions in securities of the employer." (SEC Br. at 59 n. 81).

Because the seller is the pension trust operating through the trustees, the amended complaint does not include Daniel's employers as defendants. Therefore, this opinion does not consider any possible obligations of employers under the 1933 and 1934 Acts with regard to pension plans.

stances, justifiable reliance on a material misrepresentation or omission causing them injury. If all material facts are disclosed in a manner comprehensible to the average worker, as in any other securities fraud case, no damage causation will exist under the securities laws. *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1049–1051 (7th Cir. 1977), certiorari denied —— U.S. ——, 98 S.Ct. 225, 54 L.Ed.2d 155. Thus if the plan documents sent to a plan beneficiary understandably disclose this information, a retiree who does not meet the vesting requirements will have no remedy under the securities acts, even if he subjectively did not comprehend the disclosed information. In addition, other pension funds may be immunized by the applicable statute of limitations. These considerations, as well as others, may arise here and in future cases as constraints on plan liability.

Order Affirmed.

TONE, Circuit Judge, concurring.

I am able to agree with much that Judge Cummings says in his scholarly opinion for the court, but certain doubts lead me to write separately.

For me, this is a close and difficult case. I am beset by the same doubts arising from the ordinary meaning of the words "security," "investment contract," and "sale" and from Congress' basic purpose in adopting the Securities Acts that must have influenced the several district judges who have reached conclusions inconsistent with ours. *Hurn v. Retirement Trust Fund, Etc.,* 424 F.Supp. 80 (C.D.Cal.1976); *Wiens v. International Brotherhood of Teamsters,* BNA Securities and Law Report (No. 397, April 6, 1977, p. A–13) (C.D.Cal.1977); *Robinson v. United Mine Workers of America Health and Retirement Funds,* 435 F.Supp. 245, (D.D.C.1977). The series of transactions by which Daniel acquired his interest or expectancy, such as it was, do not fit neatly into the traditional concept of a sale of a security. In addition, it may well be, as Judge Gesell believes (see *Robinson, supra*), that the *Forman* case (*United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)) and other recent Supreme Court decisions indicate "a pronounced disfavor with attempts to stretch the securities laws beyond their traditional scope." Nevertheless, considering the breadth of the definitions of "investment contract" and "sale" in the statutes themselves and the interpretation of those terms in cases we must still regard as authoritative, I believe the balance tips in favor of the plaintiff's position.

In reaching this conclusion, I have found little comfort in the opinion expressed by the SEC, as *amicus curiae.* Apparently for the first time ever, it now takes the position in its brief before us that the employee's interest or expectancy in a plan such as this is subject to the anti-fraud provisions of the securities laws. The Commission has not been as candid as we might have hoped in acknowledging and explaining its change in position. As late as 1971 in its *Institutional Investor Study* submitted to Congress in connection with the consideration of the ERISA legislation, the Commission's view was that although a non-contributory pension plan might well be an investment contract, the element of sale was lacking.[1] Before that, not even the existence of a security was acknowledged. It is true that the Commission's attention seems to have been focused largely on registration requirements rather than the anti-fraud provisions,[2] but there appears to have been no intimation over the years that it viewed the antifraud provisions as applicable. The statement in the *Institutional Investor Study* that the Commission staff "has taken the position that the Securities Act [of 1933] does not apply"[3] seemed to refer to all the disclosure provisions of that Act, not merely its registration provisions. It should be added, however, that the SEC's former

1. 3 SEC *Institutional Investor Study* 996 (1971).

2. Between which a distinction can rationally be drawn. See *SEC v. National Securities, Inc.,*

393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969).

3. Cited at note 1, *supra.*

position appears to have initially been based in large part on the unduly restrictive view that the employer's contribution on behalf of the employee was a gift and that a necessary volitional element was lacking; and, so far as its public statements disclose, the Commission persisted in that position without any real reexamination of its basis.

Members of Congress considering legislative proposals after the adoption of the securities acts who relied on the SEC's interpretation of those acts must have understood that they did not apply to transactions of the kind before us. It is realistic, however, to believe that most members of Congress understood that the SEC is not infallible, that the Supreme Court has been known to disagree with that agency's interpretation of the securities acts, and that the applicability of those acts to various kinds of transactions, including non-contributory pension plans, has yet to be determined by the Supreme Court. It appears likely that Congress has chosen to leave the matter in that posture. I find no persuasive evidence to the contrary in the legislative history subsequent to the adoption of the securities laws.